**SCHMIDT et al. v. HARRELL et al.**

No. 9871.

Court of Civil Appeals of Texas. Galveston.

Feb. 7, 1934.

Rehearing Denied March 1, 1934.

Fouts, Amerman, Patterson & Moore, of Houston (A. E. Amerman, of Houston, of counsel), for appellant Sunylan Co.

Williams, Lee, Sears & Kennerly, of Houston (Geo. D. Sears, of Houston, of counsel), for appellants H. G. & F. C. Schmidt.

James B. & Charles J. Stubbs, of Galveston, for appellees.

LANE, Justice.

In the spring of 1925 the Sisters of Charity of the Incarnate Word, a corporation, W. P. Hammond, F. C. Stewart, E. F. Simms, J. W. Lockett, Union National Bank, W. P. Hamblen, Mary A. Hamblen, W. H. Chudleigh, Jas. A. Painter, Wm. H. Olschewske, Russell F. Harrison, Fannie A. Roose, M. L. Trost, and H. G. and F. C. Schmidt, brothers, owning land fronting on Lawndale avenue in the city of Houston, signed and presented, or caused to be presented, to the city council of the city of Houston, Tex., the following petition:

"To the Honorable City Council of Said City:

"We the undersigned property owners residing or owning property in or along the right-of-way of the hereinafter proposed improvements do hereby respectfully petition your honorable body as follows:

"That the city by and through its engineering department, plan, lay out and prepare specifications for and in due legal form, let the contract for, and supervise, the construction of a sanitary sewer from the present terminus of the city sanitary sewer down Lawndale Avenue and Telephone Cut-off Road to the building or at a point opposite

a building on the property of the Sisters of Charity of the Incarnate Word.

"That the cost of said improvements (including the Engineering cost) be assessed and borne by the owners of the property of, on, or adjacent and abutting said improvements in proportion to the amount of front footage owned by them on the following basis: Each property owner on both sides of the street or road, facing said sewer shall pay one dollar and fifty-five cents ($1.55) per front foot on the frontage of said property owned, the total cost of said sewer will not exceed three dollars and ten cents ($3.10) per linear foot. All such amounts to be payable by said property owners either in cash or in five equal, annual installments, one, thirty (30) days after completion of said improvements and acceptance by the City Engineering Department; one, a year after date of such acceptance; one, two (2) years from said date; one, three (3) years after said date; one, four (4) years after said date with interest thereon at the rate not to exceed eight per cent. (8%) per annum until paid. Any of said property owners, to have the privilege of paying any of the said installments before maturity by paying all such principal and accrued interest to that date. Said property owners to give as security for such deferred payments a lien on such property so owned by them in the area of said improvements.

"Each of us, whose name is hereto subscribed, hereby severally agree to pay to the contractor to whom said work may be let, the amount and proportions of the cost hereof, which may have been assessed against us respectively in accordance with the terms hereof, and said contract."

The signatures to the petition were obtained by Mr. Ed. Harrell, who circulated the same mainly at the solicitation of the Sisters of Charity. Such petition, after having reached the city council, was by it referred to J. H. Painter, assistant city attorney.

On May 25, 1925, J. H. Painter returned the petition to the city council, as shown by the following letter introduced in evidence:

"Houston, Texas, May 25, 1925.

"To the Honorable Mayor and City Council:

"Gentlemen: Herewith I hand you petition for construction of a sanitary sewer from the present terminus from the City sewerage down Lawndale Avenue and Telephone Cutoff Road to a point opposite the building on the property of the Sisters of Charity of The Incarnate Word.

"This was taken up by me at the request of the Mayor, and Mr. Ed. Harrell assures me that he has the signature of every property owner *on both sides of the proposed extension with the exception of the Houston Belt & Terminal Company,* who are willing to sign this, but requests before then a letter from the Mayor for the benefit of the Interstate Commerce *Company* to the effect that should the City at any time within. the next ten years extend this sewer further that they will reimburse them for their expenditure on the main line portion thereof.

"Yours very truly,

"J. H. Painter, Asst. City Attorney."

(Italics ours.)

On the 10th day of August, 1925, the city council passed an order authorizing the city engineer to do all engineering and inspection necessary in the construction of the sanitary sewer on Lawndale avenue from Telephone road to Wayside drive; the property owners entering into contracts for the construction of such sewer.

The property frontage, on that part of the avenue on which the sewer was to be constructed, of the several property owners, and the amount to be assessed against each in accordance with the plan submitted by the above mentioned petition, is as follows:

North Side.

| | | |
|---|---|---|
| H. B. & T. Ry. Co. | 356.0 ft. | $ 567.41 |
| James A. Painter, | 632.0 ft. | 1,007.31 |
| Fannie H. Roose, | 245.0 ft. | 390.49 |
| Martin L. Trost, | 76.0 ft. | 121.13 |
| Walter Chudleigh, | 201. ft. | 320.36 |
| F. C. Stewart, | 144.0 ft. | 229.51 |
| John S. Stewart, | 540.5 ft. | 861.47 |
| & | | |
| J. W. Lockett | | |
| E. F. Simms, | 1,757.0 ft. | $2,800.38 |

South Side.

| | | |
|---|---|---|
| B. H. Hemphill, | 50.0 ft. | $ 79.69 |
| Kluever Moreland | 50.0 ft. | 79.69 |
| R. N. Vickers, | 50.0 ft. | 79.69 |
| Lovejoy & McCarty, | 50.0 ft. | 79.70 |
| Kluever Moreland, | 50.0 ft. | 79.70 |
| Lovejoy & McCarty, | 50.0 ft. | 79.70 |
| Kluever Moreland, | 64.3 ft. | 102.48 |
| H. B. & T. Ry. Co., | 900.0 ft. | 1,434.46 |
| Wm. Olschewske, | 237.0 ft. | 377.74 |
| W. R. & A. R. Hamblen, | 359.0 ft. | 572.19 |
| W. P. Hammond, | 669.5 ft. | 1,067.08 |
| Henry & A. F. Schmidt, | 823.3 ft. | 1,312.21 |
| Sisters of Charity of Incarnate Word, | 1,379.2 ft. | 2,198.23 |
| J. E. Scott, | 100.0 ft. | 159.38 |

Total Frontage, North Side 3,951.50
Total Frontage, South Side 4,832.30

Total, 8,783.80 ft.

Plans and specifications having been theretofore prepared and filed in the engineer's office, on May 25, 1925, E. K. High submitted

a bid in accordance with such plans and specifications, agreeing to construct the sewer for the sum of $12,907 on a unit basis. The contract to construct the sewer was awarded to High on his bid, and on the 25th day of September, 1925, the city council authorized the mayor to execute a contract with High, and recited that the citizens and abutting property owners had agreed to pay all the costs thereof; that the city of Houston "has advertised for bids and under the agreement of such citizens to so pay the cost of laying thereof, has awarded said contract to E. K. High," and that High had filed a letter with the council agreeing that the city, in signing the contract, should be relieved from the payment of any sums of money whatsoever.

The petition contract had been signed by H. G. Schmidt acting for himself and his brother. Some time in September, 1925, before the contract was executed and long before the work was completed, High was seeking to have the signers execute notes and deeds of trust. He secured such instruments as called for in the original petition contract from a number of the parties, among them Mr. E. F. Simms and W. H. Olschewske. About this time he called over the telephone Frederick Schmidt, who had not signed the contract and knew nothing of it, having left the matter to his brother, Henry Schmidt. High states that this Schmidt said that they were not at that present time interested; that they contemplated selling the property, and if they did they would not sign whether the sewer was put in or not.

The undisputed testimony of Frederick Schmidt on the trial of the suits hereinafter mentioned was, that in the phone conversation above mentioned High asked him for the cash for payment on the proposed sewer, and that he told High that his brother, Henry, had signed the contract or petition therefor, and was handling the whole situation, and that he was out of town; that he, Frederick, did not know a thing about it.

Shortly after such conversation High proceeded with the work of constructing the sewer under his contract, and shortly thereafter the Schmidts conveyed their property fronting on said street to the Sunylan Company, a corporation. The Schmidts and the Sunylan Company had a dispute about who should pay the taxes due on the property for the year 1926, and the Schmidts, under the advice of their attorney, had refused to pay High their proportionate part of the sewer cost, which they were obligated to pay only under the terms of the petition signed by

them asking the city council to have the sewer constructed, and wherein they promised and agreed to pay to the contractor to whom the work might be let the amount and proportion of the cost of such sewer as was under the terms of the petition assessable against them; it being contended by the Schmidts that no part of the assessment, under the terms of the petition, was compulsorily payable until after the sewer was completed and accepted by the city; that as the title to the property had passed to the Sunylan Company before the sewer was constructed, said company should pay the assessment made against the land.

Such dispute and the refusal or failure of both the Sunylan Company and the Schmidts to at that time pay such assessment prevented the Sunyland Company, the vendee of the Schmidts, from getting a sewer connection at the time it applied therefor.

Just before the phone conversation between High and Frederick Schmidt took place, which was in the latter part of the summer of 1925, a little more than a year before the sewer was completed and accepted by the city council, Ed. H. Harrell and E. K. High, the contractor, called on the several owners of properties fronting on the street upon which the sewer was to be constructed, with the request that they make arrangements for payment of the sums assessed against them, respectively.

After starting the work of construction of the sewer, High, finding himself financially unable to complete the work unless those petitioning therefor would in advance of such completion of the sewer and acceptance thereof by the city pay the cash and execute the notes called for in the petition asking for the construction of the sewer, and finding that some of the signers of the petition refused to pay any part of their tentative obligations in advance, or to execute the notes therefor, he called on Mr. Ed. H. Harrell and stated to him that he would not further proceed with the construction of the sewer unless Harrell would guarantee certain payments. Whereupon Harrell wrote High a letter of date November 5, 1925, the pertinent parts of which are as follows:

"Dear Sir: I guarantee to you payment on Lawndale Sewer aggregating Eighty four hundred seventy five and 58/100 ($8475.58) Dollars; said amount to be paid by me to you on partial payment on certificates furnished by the City Engineering Department, and upon completion and acceptance of said Lawn-

dale Sewer, I agree to pay you the balance, if any, of the aggregate amount $8475.58.

"The aggregate amount for which I am responsible for, is made up, to wit:

| | |
|---|---|
| H. B. & T. Railway Company | $2,001.87 |
| Sisters of Incarnate Word | 2,198.23 |
| F. C. Stewart | 229.51 |
| Jno. Stewart and L. W. Lockett | 861.47 |
| W. R. & A. R. Hamilton | 572.19 |
| E. F. Simms | 560.07 |
| | $6,423.34 |

Subscription Fund.

| | |
|---|---|
| Kluver Moreland | $ 261.87 |
| Lovejoy & McCarthy | 159.40 |
| B. H. Hemphill | 79.69 |
| R. N. Vickers | 79.69 |
| J. E. Scott | 159.38 |
| Henry & A. F. Schmidt | 1,312.21 |
| | $8,475.58" |

By reason of the refusal of the Schmidts and others to pay the assessments made against their several properties there would be about the sum of $2,052.24 short of the amount to be paid to the contractor High.

Mr. Ed. H. Harrell, being desirous that the Sisters of Charity should obtain sewer facilities, obtained subscriptions from a number of persons, among such being the H. & B. T. Railway Company.

On October 1, 1925, a short time after the execution of the contract for the construction of the sewer by High and the city, High, E. E. Clancy, and W. F. Warfield entered into an agreement of partnership, and it was agreed that among the contracts to be performed by the partnership was the sewer contract let to High. E. E. Clancy was the office man of the copartnership.

With the funds received from subscribers to the sewer petition and others from whom Harrell obtained subscriptions to make up the amount due contractor High, Harrell upon several dates delivered to E. E. Clancy a sum of money for the purpose of paying High the sum due him for constructing the sewer.

On September 23, 1927, High filed suit in the district court of Harris county, in cause 138,565, styled E. K. High v. H. G. & F. C. Schmidt and the Sunylan Company, seeking to recover upon the petition and contract signed by the Schmidts; and, pleading the agreement to execute a lien to secure the subscription to pay, sought to establish and foreclose a lien against the property of Schmidts, which had then been sold to the Sunylan Company. On the same day High's attorney filed a notice of lis pendens with the county clerk of Harris county.

On August 31, 1927, High's attorneys filed a petition with the city council, setting out the petition and contract of the landowners, alleging that the Schmidts had not paid their agreed proportion of the costs, and requesting that no connection permit be granted by the city until the Schmidts, or the Sunylan Company, should pay the amount due. This was referred to the assistant city attorney, who, on September 1, advised the council that the Schmidt brothers "signed a contract and petition in which they agreed to pay so much per front foot," and that neither they nor their assignees should be permitted a sewer connection until that sum was paid. On September 2d, in response to this petition, the city council of the city of Houston ordered that the city engineer be instructed to withhold the permits to H. G. and F. C. Schmidt until further notice. Copy of this resolution was transmitted to the attorney for High by the city secretary, who advised of the council's action and closed: "When Mr. High has satisfactorily adjusted his claim against the property owners, kindly advise us in order that we may issue permits for connection to the sewer."

Plaintiff Ed. H. Harrell had actual knowledge of the fact that High was seeking to enforce this contract against the Schmidts. On October 26, 1927, Mr. W. F. Carothers, then representing the Sunylan Company, wrote Mr. Harrell, calling his attention to the pendency of this suit, and advising that if Harrell would intervene, Sunylan Company would deposit the amount in controversy for determination by the court. Harrell refused to intervene.

About this time an agreement was reached between the Schmidts and Sunylan Company in order to compromise their differences. It was agreed that if the Schmidts would pay their subscription so as to make available the sewer connection, the Sunylan Company on its part would pay the taxes for the disputed year, and all matters of difference would be thus composed.

Under the terms of their contract with E. K. High, in the face of High's claim actively asserted in court, with the city of Houston by solemn resolution recognizing High as the proper payee, without whose consent no connection could be secured, the attorney for the Schmidts, on February 13, 1928, paid to E. K. High the sum of $1,200 in full settlement of his interest in the Lawndale sewer as against the Schmidts, and took from him a receipt therefor, and an assignment and transfer of his interest in the sewer line.

576

On September 2, 1927, the city council entered an order directing the withholding of permit for sewer connection until Mr. High was paid for the construction of such sewer, especially to the Schmidts.

On March 21, 1928, for some cause not shown by the record, the city council rescinded the order of September 2, 1927, and entered an order that sewer connections should only be made under such terms as the city may prescribe.

The Sunylan Company was apprised of the payment made to High and his acknowledgment that such payment was in full of the Schmidts' assessment, and, being told that sewer connection had been made available, it then made application to the city for sewer connection, which permit was granted upon conditions prescribed by the city council by an ordinance, the pertinent parts of which are as follows:

"Whereas, heretofore, during the year 1925, the following named property owners owning property adjacent to Lawndale Avenue, namely, Sisters of Charity of the Incarnate Word, and H. B. & T. R. R. Co., James A. Painter, Fannie H. Roose, Martin L. Trost, Walter Chudleigh, F. C. Stewart, Union National Bank and J. W. Lockett, E. F. Sims, Wm. Olschewske, W. R. & A. R. Hamblen, and W. P. Hammond, constructed and paid for the sanitary sewer on Lawndale Avenue from Telephone Road to Wayside Drive in accordance with the provisions of the ordinance of the City of Houston providing for the construction of sewers by persons, or property owners, adjacent to such sewer; and,

"Whereas, at the time of the construction of said sewer Henry A. and A. F. Schmidt owned a tract of land adjacent to said sewer having a frontage of 823.3 feet on Lawndale Avenue and the proportion of the cost of such sewer apportioned to the said land, as shown by the schedule filed with the City of Houston was Thirteen Hundred Twelve and 21/100 ($1312.21) Dollars, which was not paid and the said Sunylan Company has since purchased the said land having notice at the time of such purchase that said portion of Thirteen Hundred Twelve and 21/100 ($1312.-21) Dollars had not been paid; and

"Whereas, the said Sunylan Company now desires a permit permitting it to connect a 'lateral sewer' described in its application for a permit with said sewer on Lawndale Avenue, and it appearing that it is consistent with the good of the sewer system of the City of Houston to permit such connection therefor;

"Now, therefore, be it ordained by the City Council of the City of Houston:

"Section 1. That the said Sunylan Company be granted a permit to connect said 'lateral sewer' with the said sanitary sewer on Lawndale Avenue, upon condition that the said Sunylan Company first deposit with the City Engineer of the City of Houston for the use and benefit of those who originally constructed or paid for the said sanitary sewer on Lawndale Avenue the sum of Fifteen Hundred Sixty Four and 65/100 ($1564.65) Dollars, which the said Council hereby fixes and declares to be a reasonable sum for the making of such connection."

The Sunyland Company, after some delay, under protest deposited the $1,564.65 called for in said ordinance with the city council.

Ed. Harrell brought this suit, alleging himself as trustee for the use and benefit of the Sisters of Charity of the Incarnate Word, a corporation, against the city of Houston. In his original petition he alleges that the $1,-564.65 deposited by the Sunylan Company under protest with the city of Houston was retained in the treasury of the city pending suit; that such sum was so deposited for the benefit of him as trustee for the Sisters of Charity of the Incarnate Word, but that the city had failed and refused to pay said sum to plaintiff, to his damage in said sum, to which he is entitled in its entirety to the exclusion of all other parties; that he originally constructed and paid for the sewer. He alleged the passage of the ordinance, the pertinent parts of which have been set out above, and alleged that the Sunylan Company deposited said sum of $1,564.65 under the terms of said ordinance.

He further alleged as follows: "That it was mutually understood and agreed between him and E. K. High that E. K. High should collect direct from James A. Painter, Martin L. Trost, Walter Chudleigh, Wm. Olschewske, Fannie Roose, E. F. Simms, W. P. Hammond (who were abutting property owners), their pro rata share of the cost of construction and that E. K. High, his partners, agents, employees, representatives and attorneys did collect from the above property owners their pro rata share of the cost, in the aggregate sum of $5674.41, more or less;

"That it was further mutually understood and agreed between plaintiff and E. K. High that plaintiff was to collect pro rata from Houston B. & T. R. R. Co., F. C. Stewart,

Union National Bank and J. W. Lockett, E. F. Simms, W. R. and A. R. Hamlin and the Sisters of Charity of the Incarnate Word, and plaintiff did collect same in the aggregate sum of $6423.37, more or less, and did pay said sum over to E. K. High, his partners, agents, employees, representatives and attorneys.

"That E. K. High informed plaintiff that certain of the abutting property owners, among others Henry and F. C. Schmidt, absolutely refused to contribute to the construction of the proposed sewer, or to have anything to do therewith, or to be parties to the enterprise; and plaintiff shows that Henry and F. C. Schmidt did absolutely refuse to contribute to the construction of the proposed sewer, or to have anything to do therewith or to be parties to the enterprise; whereupon plaintiff guaranteed and undertook and promised to pay the said E. K. High the amounts for which Henry and F. C. Schmidt and others had failed and refused to obligate themselves for, in the sum of $2052.24, and plaintiff further guaranteed and undertook and promised to pay to the said E. K. High in cash the amounts assessed against the Sisters of Charity of the Incarnate Word, H. B. & T. R. R. Co., and others (who had not refused to pay) in the sum of $6423.34, making a total of $8475.58, which plaintiff guaranteed and undertook and promised to pay the said E. K. High."

Other allegations were made in the petition which, with the exhibits made a part thereof, covered twenty-five pages of the record, but in view of the preliminary statement made herein we deem it unnecessary to set them out here.

On the 27th day of August, 1927, the Sunylan Company and W. R. Archer filed suit against Frederick C. and Henry Schmidt. They alleged that Archer purchased the Schmidt property as trustee of the Sunylan Company. Recovery was prayed for against the Schmidts for the sum of $1,709.01 which was for unpaid taxes owing by the Schmidts on the property sold to Sunylan Company.

On December 31, 1931, the two suits were consolidated for trial, and after such consolidation the Sunylan Company became cross-plaintiff as against E. H. Harrell, the city of Houston, and H. G. and F. C. Schmidt. It denied generally allegations of all adverse parties and specially alleged that after the contractor, High, had begun construction of the sewer he demanded of the Schmidts and other petitioners that they pay the several assessments made against their several prop-

erties, contrary to the written agreement contained in their petition filed with the city praying for the construction of the sewer; that several of the petitioning property owners, including the Schmidts, refused to change said agreed terms and refused to pay the total amount due by them; that the Schmidts sold their property to the Sunylan Company; that after such sale High continued to demand payment from the Schmidts and the Schmidts continued to refuse to pay the assessment made against said property; that High, on the 23d day of September, 1927, filed suit against the Schmidts, the Sunylan Company, and W. R. Archer to recover the sum of $1,700; that the Sunylan Company were demanding of the Schmidts that they pay the assessment made against the property sold by them to it so as to secure for it the right of access to the sewer, which it alleged had passed as an appurtenance to said property.

Cross-plaintiff alleged further that after it had entered suit against the Schmidts to recover for the taxes due on the property, it was agreed by and between the Schmidts and the Sunylan Company that if the Schmidts would acquire for it connection with the sewer and the removal of all obstacles thereto, it would waive its claim against them for the payment of the taxes sued for; that after such agreement was so entered into, the Schmidts paid to High, the contractor, the sum of $1,200 in satisfaction of the sum sued for by High in the suit of High v. the Schmidts; that thereafter the Sunylan Company applied to the city for connection with the sewer, which application was refused, and that as a result of such refusal it has continued to demand of the Schmidts that they secure such connection, which the Schmidts failed or were unable to do; that because of such failure the Sunylan Company was required to deposit with the city the sum of $1,564.65, which was wrongfully fixed by the city as a prerequisite to the connection asked for; that to secure such connection to which it was entitled it did, under protest, make the deposit demanded on the 24th of April, 1928. It prayed for a recovery of the $1,564.65 so deposited with the city, and that in the event, and only in such event, that it is denied such recovery it have judgment against the Schmidts for the sum evidenced by the taxes levied against its property, which was a liability of the Schmidts.

The Sunylan Company further pleading said: "That it never at any time authorized the said Ed. H. Harrell for himself or as

Trustee, or any one else, to do the things alleged in his petition, and it denies that he had the legal right to do same, and it denies that he ever acquired any rights in and to said sewer as against the said Schmidts or this cross-defendant by anything he did, and that all of his acts and the acts of the City of Houston looking to the exclusion of this cross-defendant from said sewer were void, and that the said Harrell was a mere volunteer and intermeddler, and that this cross-defendant is ready and willing to have carried out the terms of its compromise settlement with H. G. and F. C. Schmidt, and that if it recovers the money deposited under protest with the City that it is willing and here now offers to dismiss its claim for taxes against the said H. G. and F. C. Schmidt, and it prays that the prayer of the said Ed. H. Harrell, Trustee, asking for said fund deposited in the City, be in all things denied and it have judgment for said fund so deposited, and in the event it so recovers said fund that the court will enter such proper judgment in connection with the other matters in this cause as may be proper, and that in the event they do not recover said sum then that it recover of the said H. G. and F. C. Schmidt the sum of $1564.65 with interest from the date of its payment, or, in the alternative, that it recover of and from the said H. G. and F. C. Schmidt the sum of $1709.01 paid as taxes, with interest from July 27, 1927."

H. G. Schmidt and F. C. Schmidt, appearing as cross-defendants, denied generally the allegations contained in the pleadings of all adverse parties. They specially alleged that they, acting for themselves, signed the petition for the construction of the sewer by which they agreed and bound themselves to pay to E. K. High for constructing the sewer $1.55 per front foot; that by their executing the petition with others for the construction of the sewer they agreed and bound themselves to be governed by the terms set forth in said petition; that thereafter a contract was duly let to E. K. High and he sought to have them pay in full and to sign additional obligations waiving their right to make the deferred payments called for in the petition; that in the fall of 1925 they sold their property involved in this suit to Sunylan Company; that prior to and after such sale, High continued to make demand to them for payment of his obligations created by reason of executing said petition; that as Sunylan Company was wrongfully asserting they were liable for the payment of taxes due on said property in the sum of $1,700, for which

it sued, they declined to pay High; that it was thereafter agreed between Sunylan Company and them that if they would satisfy the claim of High against them, that Sunylan Company would dismiss its suit for taxes; that in pursuance of such agreement they did pay High the sum of $1,200 in full and final settlement of his claim against them on their subscription and took an assignment of all his rights in said sewer line which fronted on the property belonging to Sunylan Company, and thus made available to said company the result of such assignment.

Further pleading, they alleged: "That they did not know the plaintiff Ed. H. Harrell in the transaction and had no notice or knowledge that he had acquired by assignment, subrogation or otherwise, the claim and chose of action which E. K. High was asserting in his said suit in the district court of Harris County; that they never at any time authorized, empowered or requested the said Ed. H. Harrell to pay their proportionate part of said sewer costs to the contractor E. K. High, and had no notice or knowledge that he had done so, which is not admitted, but here expressly denied; that by reason of which things these defendants say that if the said E. K. High was paid in full the contract price for said sewer, and if in fact the said Ed. H. Harrell paid the debt of these defendants as Trustee by subscription, or otherwise—which things are not admitted but expressly denied—then the said Ed. H. Harrell was a mere volunteer and intermeddler; that he took no steps and gave no notice that he had acquired or attempted to acquire the rights being asserted by E. K. High in his suit and his action in this regard and any action on the part of the City of Houston seeking to change, amend or alter the contract rights existing between E. K. High and these defendants, without the notice, knowledge or consent of these defendants and without affording to these defendants any defense against the claims still being asserted by the said E. K. High, were and are nullities and of no force and effect."

They plead that by reason of the things alleged they are not liable to the Sunylan Company in any sum whatever.

The city of Houston answered and tendered the money deposited with it by Sunylan Company into court, saying that it had been so deposited under protest, and that notice had been served on the city at the time of such deposit not to pay it to any one, but to hold the same subject to the determination of the rights of certain claimants thereto. It prayed that the Sunylan Company be made a party

to the suit in order that the respective rights of the parties might be determined. The city took no further part in the litigation.

On the 26th day of April, 1932, the day on which the judgment was finally rendered, the Sisters of Charity of the Incarnate Word, for some reason, intervened in the suit and disclaimed in favor of the original plaintiff, Ed. H. Harrell, to the deposit made by Sunylan Company with the city, and on the same day Harrell filed what he designated as "plaintiff's trial amendment."

Upon the facts shown by the undisputed evidence, which we have substantially stated in our preliminary statement, and upon the pleadings, the court, trying the case without a jury, rendered judgment for Ed. H. Harrell, decreeing that he should recover from the city of Houston the $1,564.65 deposited with the city by the Sunylan Company, as prayed for by Harrell as against all parties, and that Sunylan Company recover of H. G. Schmidt and F. C. Schmidt the sum of $1,564.65, together with interest from the 11th day of April, 1928, to date of judgment, a total sum, principal and interest, of $1,940.13.

From such judgment the Sunylan Company and H. G. and F. C. Schmidt have appealed.

Appellant Sunylan Company insists on appeal:

(1) That the undisputed evidence entitled it to a reversal of so much of the judgment as was in favor of Harrell for the deposit it made with the city under protest, and the rendition here of a judgment in its favor for such deposit.

(2) That if it is held that it is not entitled to the rendition of judgment in its favor for the deposit, then, and in that event only, it says that the judgment as a whole should be reversed and the cause remanded, in that as shown by the ordinance requiring the deposit with the city by the Sunylan Company it was deposited for the use and benefit of those named in said ordinance, to wit: "Sisters of Charity of the Incarnate Word, and H/B & T. R. R. Co., James A. Painter, Fannie H. Roose, Martin L. Trost, Walter Chudleigh, F. C. Stewart, Union National Bank, and J. W. Lockett, E. F. Simms, Wm. Olschewske, W. R. and A. R. Hamblen, and W. P. Hammond."

Wherefore, such parties were necessary and indispensable parties to the suit of Harrell, and they were not made parties thereto.

The majority of the court sustains both of such contentions, but as we hold that the first should be sustained and a judgment should here be rendered in favor of Sunylan Com-

pany for the deposit sued for by its cross-action, the reversal of the judgment for the purpose of making new parties becomes unnecessary.

As shown by the petition above set out, several parties, among them H. G. and F. C. Schmidt, signed and presented to the city council of the city of Houston a petition requesting the council to have plans and specifications prepared for the construction of a sanitary sewer along Lawndale avenue in said city, and to let a contract for the construction of the sewer. By such petition they stipulated that the cost of such construction should be $1.55 per front foot, not to exceed $3.50 per linear foot. They by the petition obligated and bound themselves that in the event the sewer was constructed and accepted by the city to pay to the party constructing the same the amount stipulated in the petition, that is, $1.55 per foot frontage on their respective properties as follows: "All such amounts to be payable by said property owners either in cash or in five equal, annual installments, one, thirty (30) days after completion of said improvements and acceptance by the City Engineering Department; one, a year after date of such acceptance; one, two (2) years from said date; one, three (3) years after said date; one, four (4) years after said date with interest thereon at the rate not to exceed eight per cent (8%) per annum until paid. Any of said property owners to have the privilege of paying any of the said installments before maturity by paying all such principal and accrued interest to that date. Said property owners to give as security for such deferred payments a lien on such property so owned by them in the area of said improvements."

After the receipt of the petition mentioned, the city council had the plans and specifications called for in the petition made, and upon said petition, plans, and specifications let the contract for the construction of the sewer to E. K. High; it being agreed between the city and High that he should look to the subscribers to the petition for payment in accordance with the terms stipulated in the petition, and that the city would pay no part of same.

After entering into such contract, High began the work of construction of the sewer and soon found himself unable financially to complete the sewer, unless the subscribers to the petition for the sewer would at that time pay their several subscriptions. Some of the subscribers met High's demand for payment in advance of the completion and acceptance of the sewer. At the time High called for payment in advance of the time fixed by the con-

tract made with the city council, H. G. Schmidt and F. C. Schmidt were negotiating a sale of their property, which was assessable under the contract made with the city council, to the Sunylan Company. While such negotiations were pending, High spoke to F. C. Schmidt over the phone and asked that he and his brother, H. G. Schmidt, pay or secure payment of the amount assessed against their property. In answer to such request, F. C. Schmidt replied over the phone that they at that time were not interested as they expected to sell their property to the Sunylan Company. A short time after such phone conversation the Schmidts sold their property to the Sunylan Company and conveyed the title thereto by warranty deed. After such sale was made, the Schmidts were contending that the Sunylan Company should pay the assessment made for the sewer construction against the property conveyed. On the other hand, the Sunylan Company contended that under their warranty the Schmidts were obligated to pay such assessment. Because of such controversy, neither the Schmidts nor Sunylan Company would assume payment of said assessment.

By reason of the failure and refusal of the Schmidts and some other subscribers to the sewer petition to pay, a deficiency of $2,052.24, in the amount which High was to be paid under his contract with the city, existed. Whereupon, High informed Ed. H. Harrell, who had with High got the signatures of the several property owners to the sewer petition, of such deficiency, and stated to him that unless such deficiency was paid to him he would not complete the sewer. Upon receiving such information Ed. H. Harrell, because of his friendship to the Sisters of Charity of the Incarnate Word, who were anxious to have the sewer constructed, solicited and obtained from certain persons, friends of his and of the Sisters, funds to make up such deficiency, which he says he held as trustee for those who had paid the assessment made against their several properties. Such sum so obtained was paid by Harrell to High in satisfaction of the sum due him for constructing the sewer.

After the sewer was completed and accepted by the city, and as the assessment made against the property of the Schmidts was unpaid, High brought suit against the Schmidts to recover the sum assessed against the property owned by them. Pending such suit the Sunylan Company, desiring to connect with the sewer, entered into an agreement with the Schmidts that if they would satisfy the demand made by High against them, the Suny-

lan Company would remit its claim against the Schmidts for the taxes due on the property. Upon such agreement, the Schmidts paid High $1,200 in satisfaction of his demand, and High's suit was dismissed. After such payment to High was made, the Sunylan Company demanded of the city that it be permitted to connect with the sewer. Such connection was thereafter granted upon conditions only as shown by the ordinance passed by the city council which we have hereinbefore set out, which said ordinance, as prerequisite to the right of the Sunylan Company to have such connection, required a deposit with the city of $1,564.65. Such sum, as already stated, was deposited with the city under protest.

The trial court as a basis for its judgment held, in effect, that the Schmidts had withdrawn and annulled their part of the contract made with the city for the construction of the sewer by the phone conversation mentioned above. Notwithstanding such holding, however, and notwithstanding the fact that the Schmidts had paid High $1,200 in satisfaction of the amount due by them to High for the construction of the sewer, the court held that Harrell was subrogated to the rights of High to recover the $1,564.65 deposited with the city by the Sunylan Company to repay him for the sum he had voluntarily paid to High to get him to complete the construction of the sewer.

The majority of this court concludes that the contract entered into with the city by the Schmidts by the petition asking for the construction of the sewer, wherein and whereby they promised to pay to the contractor the sum to be assessed against their property upon the completion of the sewer and its acceptance by the city, became and is a binding contract on the part of the Schmidts from which they could not withdraw, and therefore the trial court erred in holding to the contrary. Indeed, both High, the contractor, and the Schmidts recognized the Schmidts' primary liability to pay their part of the cost of constructing the sewer, as evidenced by High's suit against the Schmidts and the Schmidts' satisfaction thereof by the payment of $1,200 to High.

Upon the satisfaction of High's suit by the Schmidts, the Sunylan Company, the vendee of the Schmidts, had the right to a connection with the sewer without making the deposit demanded by and deposited with the city. Such being its right, it is now entitled to a recovery of the sum of $1,564.65 deposited with the city and by the city deposited in the registry of the trial court. High's claim

against the Schmidts was never transferred by High to Harrell, nor did the Schmidts ever at any time promise to pay the same to Harrell. Harrell was not the assignee of High. He was a mere volunteer in his attempt to pay the debt of the Schmidts to High.

Under such circumstances, neither the Sisters of Charity of the Incarnate Word nor Harrell is entitled to a judgment for the sum deposited by the Sunylan Company with the city.

For the reasons pointed out, so much of the judgment as awarded to Ed. H. Harrell the sum deposited in court by the city of Houston is by a majority of this court reversed, and judgment is here rendered awarding to the Sunylan Company a recovery of said sum, and since the Sunylan Company is asking for an affirmance of the judgment rendered in its favor against H. G. and F. C. Schmidt only in event it was denied a recovery of its deposit with the city, such judgment against the Schmidts is reversed, and it is hereby decreed that they go hence without day.

Justice GRAVES dissents from so much of the conclusions of the majority that the judgment should be reversed and here rendered for appellants.

The majority of this court has found from the facts shown that the Sunylan Company was the exclusive owner of the deposit made with the city, and that neither Harrell nor any of the parties named in the ordinance requiring such deposit to be made owned any interest therein, and therefore none of them was a necessary party to the suit.

We therefore hold that the judgment should not be reversed and remanded for the purpose of making any of such parties party to this suit.

The judgment is reversed, and judgment is here rendered for the Sunylan Company and H. G. Schmidt and F. C. Schmidt, as above stated.

Reversed and rendered.

GRAVES, Justice (dissenting).

Not being in accord with the holdings of the majority affecting rendition, I dissent therefrom under the individual conclusion that the signers of the original petition to the city council for the sewer, or at the least such of them as paid the assessments subsequently made against them pursuant thereto, were necessary parties to the suit, and that in consequence of their not having been brought in the cause should have been remanded for a

trial de novo as to who owned the fund involved with them also before the court.

On Motion for Rehearing.

PER CURIAM.
Rehearing denied.

GRAVES, Justice (dissenting).

In the original dissenting opinion the term "assessments" was inadvertently used as if there had been assessments made by the city against the property owners for the sewer involved, pursuant to the original petition to the city signed by such owners; that was an error of expression, since the record shows the city never made any such assessments, the idea in mind at the time evidently having been that the joinder of the owners in the petition for the improvements, by force of that request itself, amounted to an apportionment of the cost between them according to the frontage owned by each.