**SOUTHWESTERN INDUSTRIAL PRODUCTS COMPANY, Appellant,**

v.

**CHIPPEWA MOLDING, INC., Appellee.**

No. 17324.

United States Court of Appeals
Fifth Circuit.

Jan. 20, 1959.

A. W. Salyars, Homer L. Pharr, Lubbock, Tex., for appellant.

Hugh Anderson, Lubbock, Tex., Frank W. Auer, Eau Claire, Wis., for appellee.

Before HUTCHESON, Chief Judge, and CAMERON and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

Involved here are questions under Texas law relating to delivery of defective goods by a seller, the use thereof by the buyer after knowledge of possible defective characteristics, payment, complete or partial, by the buyer and the significance, whether as a matter of fact or law, of such circumstances as constituting waiver of the breach by the buyer. The District Court, without opinion, entered an order which is self-described as a judgment "notwithstanding such verdict" allowing recovery in full to the Seller (Chippewa) for the outstanding unpaid balance of the open account. It also denied any recovery to Buyer (Southwestern Industrial Products Company) on its cross claim for the damages the jury found had been sustained by it flowing from the return or replacement of the damaged goods which Buyer had sold to its farmer customers. Presumably the Court concluded that Buyer had, as a matter of law, waived the defective performance by Seller. The Buyer appeals.

I.

The product involved is polyethylene layflat tubing of 4 to 16 inches width in a flat shape, which expands when filled with fluid to form a thin-walled flexible tubing of 3 to 10 inches in diameter. Leaverton, the moving figure of Buyer, was experienced in plastics. In early 1955 he conceived the idea that polyethylene 20-gauge tubing (walls of 20/1000 of an inch thickness) would be an economical substitute for the more expensive aluminum pipes or canvas tubes currently being used in the new postwar irrigation areas of West Texas. He sought out Seller, a manufacturing processor of commercial standard plastic extrusions. Seller knew that Buyer intended to, would, and did sell the tubing to farmers so, absent some limitation in the sales contract, Seller would be liable for special damages.

It was Seller's theory that it had never represented that this fragile material would be able to withstand the stresses incident to its use in transporting large columns of water (4 to 10 inches in diameter) under volumes as high as 1200 gallons per minute. All it had done, it claimed, was to sell the tubing with the hope so optimistically reflected in many ways by the Buyer, that experimentation would prove this to be feasible and hence an outlet for substantial sales profits for both. The Buyer, on the other hand, took the position, at least on the trial, that with knowledge of its intended use, Seller in effect represented that it was fit for this work. But the Buyer's theory was not restricted to the sufficiency of the tubing generally to do the job. The Buyer contended that the tubing in controversy was not sound plastic extrusions of the grade pur-

chased, but was defective in its manufacture. The defects were of two principal kinds, (1) pinholes and (2) slits or tears in the layflat seams or folds formed as it was wrapped into rolls.

■ The jury, on a special issue verdict, F.R.Civ.P. 49, 28 U.S.C.A. held for both. Issue No. 1 determined in effect that Buyer had undertaken all risk for the use of such delicate tubing in such irrigation operations insofar as it concerned the inherent capacity of the tubing to withstand the pressures and stresses of such use. The key, however, was that the tubing was to be free of intrinsic defects of manufacture. By Issue No. 2 it was determined that the tubing was not of merchantable quality.[1] Seller does not, indeed cannot, contend that its "merchantable quality" was not warranted.[2] Issue No. 4 determined that "some of the lay-flat tubing" failed in normal expected irrigation usage [3] from defects in material and workmanship in its manufacture. On the basis of that answer it was successively found [4] that the Buyer justifiably had to (a) replace such defective tubing to its customers and make (b) credits and (c) cash refunds to customers, and (d) incur certain out-of-pocket expenses of $866.61. Each and all of such findings expressly excluded any amounts "for tubing which you may find was damaged by outside forces."

We think there was sufficient evidence to sustain such findings. This includes the amount and quantities of tubing replaced or on which credit or cash refunds were given.[5] But for reasons later discussed (see V. infra), we do not approve the amounts in money as fixed by the jury in answer to Issues 6, 7 and 8, note 4, supra.

The Buyer acknowledged categorically that no guaranty as such was ever made, and from the correspondence the jury could conclude that the normal risk of usage of this untried material was to be on the Buyer. That eliminated the warranty which the law would normally imply as to the fitness of goods to do a known job. 37a Tex. Jurisprudence, Sales, § 163 (1957). But from the invoice form, note 2, supra, and from other evidence, written and oral, the jury could just as well conclude that Seller, as a responsible manufacturer, was representing that its goods were free from defects in material and manufacture.

1. The issue defined this without objection as "reasonable fitness to be a marketable product for use as a water conduit under circumstances which would not strain such tubing beyond the natural durability and strength of polyethylene material."

2. The uniform invoice prescribed terms and conditions of the sale including:
"*Warranty:* Seller warrants merchandise shipped to any buyer to be of merchantable quality. Seller makes no warranty of any other kind, expressed or implied. No stipulation, agreement or understanding of the buyer shall be valid or enforceable unless in writing by a duly authorized officer of the seller.
"*Seller's liability:* Liability for loss or damage due to the use of seller's product is limited to the seller's price list of any of its products. Seller shall not be liable because of late or non-deliveries due to strikes, fire, inability to procure raw materials, labor difficulties, or other causes beyond seller's control."

3. This was the standard submitted without objection in Issue 4: was the tubing " * * * defective in the sense that, in ordinary usage as a conduit for irrigation purposes on farms at different contour and topography, and without being damaged from the outside, same developed slits and holes, due to defects in material or workmanship in the structure of such tubing?"

4. The jury found that Buyer incurred the following losses for replacements, credits and refunds:
(a) replacements
(inc. freight) Issue 6 $6,614.60
(b) Customers accounts credited Issue 7 7,064.16
(c) Cash Refunds Issue 8 4,383.54

5. The quantities, description of the goods, the names of the customers and dates were listed on "defendant's and cross-plaintiff's Exhibits I, II and III." Seller did not concede that these were correct, but it offered no evidence to refute the facts there reflected. The jury obviously accepted them as correct.

On defects in the tubing furnished by Seller to Buyer and in turn sold to Buyer's customers there was an abundance of evidence from nearly a dozen disinterested witnesses. All of them—farmers who had purchased the layflat tubing of various dimensions—testified in detail as to the manner in which the breaks would occur when water pressure was put on. From this source there was express testimony that the slits or tears occurred where the seams were flattened out in the lay-flat process or where folds had been formed as the lay-flat tubing was rolled up in manufacture. In addition there were specific instances of tears or slits or leaks in areas where the tubing had small pinholes. Each of these witnesses was cross-examined carefully, but unsuccessfully, in the effort to demonstrate that these breaks were due to external causes such as nettles, stalks, uneven ground, change in elevation from connection at the pump to the discharge end of the tubing, and the like. Taken in connection with evidence showing purchases of nearly $50,000 of such tubing, none of which, except for that involved in the replacement, credits, or cash refunds, see note 4, supra, was shown to have failed in use, the jury could well credit the testimony of these farmers and conclude that the breaks in the tubing came from intrinsic defects [6] in the material and its manufacture and not from outside agencies or the expected normal weakness of such a product.

## II.

Despite the findings which we hold were significant and supported, the Court granted judgment to the Seller and denied the cross claim of Buyer for damages from the breach. Presumably this was on the ground that the Buyer had waived the breaches.

Both theoretically, and in this case actually, such a contention presupposes that the Seller's performance was substantially deficient. Instead of denying or minimizing a breach, the effort is to magnify it to proportions demonstrating that the Buyer knew of the nonperformance but nevertheless accepted it as compliance with the Seller's obligation. It presupposes that at least at one stage the Buyer had a legal right and remedy because of the breach. The idea of this so-called waiver is that between contractual equals, an obligee has the privilege of excusing performance of any particular obligation by the obligor. It has been likened to a gift release, or satisfaction and, as such, requires no consideration as would be the case of an accord and satisfaction or a compromise settlement, to which it is frequently so nearly akin, as it sometimes is to mitigation of damages, avoidable consequences and true estoppel from detrimental reliance on a change of position. See 5 Corbin, Contracts, §§ 1244 and 1245, and 1040 (1951).

On this approach the question then is whether the obligee, as a volitional matter assented to the nonperformance. That, of course, is a question of fact and one normally for the variable inferences of the fact finder unless the evidence would permit of but a single conclusion in which case it would be one finally of law. It is the latter, so the Seller contends, which is here compelled.

The conduct relied upon is the retention of the goods, the re-sale of them to Buyer's customers in the course of his

---

**6.** Seller really never refuted any of this. For example, as to the pinholes, Seller urged that these were caused by thirst-crazed field mice. But it never offered any proof except the hearsay surmise of one of its staff. Similarly, while cross-examination of the farmers brought out that large quantities of water would be moving at high gallon per minute volume, the hydrostatic pressures of which would invariably increase if there were even a one or two foot increase in elevation between pump and cotton row outlet, not a syllable of evidence was offered to show either what the pressures were or whether it exceeded the capacity of this plastic tubing. The jury may well have attributed Seller's silence on that score to the awkward dilemma in which that would place Seller who, anxious to profit, would hardly sell a product which it knew must fail.

retail trade, and the payment thereafter, either complete or substantial,[7] of the original sales price to Seller for goods of which the defective ones were a part.

■ In some jurisdictions, e. g., Georgia, Roanoke City Mills, Inc. v. Whelchel, 5 Cir., 1953, 208 F.2d 66, and in Texas under some circumstances [8] retention of the goods and payment therefor after the purchaser is aware of the defects would amount to a waiver as a matter of law. But the Texas law reflected by an abundance of cases [9] as plainly holds that the presence of a warranty, express or implied, alters this rule. The warranty is a distinct undertaking and itself creates liabilities and rights. Ft. Worth Grain & Elevator Co. v. Walker Grain Co., Tex.Civ.App., 1914, 168 S.W. 470, error dismissed w. o. j. (Tex.Civ.App. jgmt. final), Tex.Com. App., 209 S.W. 398. If the warranty is one which by nature survives [10] acceptance, then retention of the goods and payment therefor, while constituting evidence, indeed strong evidence, permitting an inference of a purpose to waive, i. e., assent to substantial nonperform-

---

7. We accept (although we are unable to verify it by our own computations) for the purposes of the calculations made by Seller's brief from the stated accounts annexed to the original complaint that, on the principle of Aetna Casualty & Surety Co. v. Hawn Lumber Co., 1936, 128 Tex. 296, 97 S.W.2d 460, modified, 128 Tex. 460, 98 S.W.2d 167, applying payments and credits to the oldest indebtedness, the account which opened in February 21, 1955, had a zero balance as of March 26, 1956. On Seller's own figures this leaves open the replacements, credits and cash refunds totaling $6,310.80 made by Seller between March 27, 1956, and the commencement of this suit.

8. The sole Texas cases cited and relied on by Seller, all involving visible defects, are Houston Transp. Co. v. Paine, Tex. Civ.App., 1917, 193 S.W. 188, error refused (unsuitable machinery); Major v. Hefley-Coleman Co., Tex.Civ.App., 1914, 164 S.W. 445, error refused (inferior cottonseed hulls); Swift & Co. v. Robberson, Tex.Civ.App., 1956, 288 S.W.2d 226, no writ history (sick chickens).

9. Aultman & Taylor Co. v. Hefner, 1886, 67 Tex. 54, 2 S.W. 861, 863 ("Under the facts to which we have referred, there can be no pretense that Hefner waived the warranty by remaining in possession of the property, and executing notes for it, when he knew it was defective"); Wichita School Supply Co. v. Mutschler Bros. Co., Tex.Civ.App., 1929, 14 S.W.2d 922, 925 ("[T]he fact that the furniture was received, that the county paid appellant [seller] the contract price therefor, that thus far the county does not appear to have complained, and that appellant [buyer] gave its trade acceptance, are all facts tending to show the waiver claimed, but we do not think they are conclusive. * * *."); Dunlap Hardware Co. v. E. F. Elmberg Co., Tex.Civ.App., 1923, 252 S.W. 1098, 1104, affirmed, Tex.Com.App., 267 S.W. 258 ("Where an article is not wholly worthless for the purpose for which it was purchased, but is simply inferior in quality to that warranted, a retention of the article will not generally estop the buyer from urging partial breach of warranty or partial failure of consideration [cases] and he may offset his damages against the contract price."); Standefer v. Aultman & Taylor Mach. Co., 1904, 34 Tex.Civ.App. 160, 78 S.W. 552, 553 ("The judgment of foreclosure obtained by appellee [seller] against appellant [buyer] on the notes given for the purchase money of the thresher would operate as a bar of his right to a rescission, but not of his remedy for a breach of warranty. Bingham v. Kearney, 136 Cal. 175, 68 P. 597."); Ash v. Beck, Tex.Civ. App., 1902, 68 S.W. 53, 55, no writ history ("While the buyer's failure to return the goods or complain of the quality may raise a strong presumption that his action is not well founded, this is evidence on a question of fact, and is not a presumption of law * * *."); Taylor Cotton-Seed Oil & Gin Co. v. Pumphrey, Tex. Civ.App., 1895, 32 S.W. 225, 226, no writ history ("The use of the article under such circumstances would not necessarily be a waiver of the contract of warranty. Hayden v. Houghton, Tex.Civ.App., 24 S.W. 803; * * *.") Hayden v. Houghton, Tex.Civ.App., 1894, 24 S.W. 803, 804, no writ history; see 37-A Tex. Jur., Sales § 333 also 139 and 150 (1957).

10. Factually this was obviously the case here. It was not until the farmer customers put the water in the tubing that defects were revealed.

ance, does not compel it as a matter of law.[11]

■ Without a doubt a waiver could have been found. But the jury did not so find. On the contrary, by an issue to which no exception was taken as to its sufficiency to submit the matter, the jury found that Buyer had not intentionally waived the breaches. As persuasive as are the circumstances to show waiver, the evidence was nevertheless sufficiently equivocal to permit contrary inferences.

As early as April 1955, Buyer returned samples of defective tubing.[12] He did it many times thereafter. This occasioned one or more inspection trips in the Lubbock area of responsible representatives of the Seller. Letters from the Buyer, containing statements such as the following, are strong indeed: "We are not asking for anything but felt you should know about this and perhaps you can come up with a solution" (April 12, 1955); "We are not complaining only trying to find out why all of our trouble is confined to 8″ size" (May 5, 1955); "I am not asking for anything, Don [Seller's president] as we did not ask you to guarantee the end use of this tubing" (June 1, 1955). To this may be added correspondence in 1956 when strenuous efforts were being made to effect collection of the entire account in which Buyer gave assurances that it intended to pay "everything we owe."

This included the trial admission of the Buyer's president that the purpose to sue for damages was precipitated by Seller putting Buyer on a C.O.D. basis in July 1956.

But strong as are these circumstances, the jury was entitled to consider other factors. The complaints were not that the tubing was inherently unsuited, but that specific rolls, and particularly some sizes, had the described intrinsic defects in material and workmanship. There was testimony that after these complaints the Seller then assured Buyer that the defects would be remedied. And with full knowledge by Seller of these claims of defects sufficient to substantially comply with Buyer's duty to give notice under Seller's invoice terms (note 2, supra), the Buyer by letter of September 17, 1955, asserted, and Seller by its conduct thereafter entertained and acted upon, a specific request for an adjustment because of the defective tubing. As a result of these negotiations, an adjustment was actually made.[13] Whatever might have been the intrinsic deficiencies of this episode in constituting a legally valid compromise or an accord and satisfaction, it was the strongest possible evidence that Buyer was still contending that Seller had failed to perform and should make an adjustment. Perhaps both parties were more amicable than the law would require them to have been, but it was at least evidence that

11. This is well stated in C. H. Dean Co. v. Standifer, 1904, 37 Tex.Civ.App. 181, 83 S.W. 230, 231, no writ history. "The fact that the buyer may have paid the price, or part of it, or given his note for it, or the fact that, when sued for the purchase money, he did not plead the breach of warranty as a defense, as he might have done, does not debar him from recovering for the breach of warranty. * * * The cases, with few exceptions, hold that a breach of warranty may be maintained notwithstanding payment, extention of payment by renewal or otherwise, or part payment, unless an intention to waive the breach is proven. * * * While, as held in Ash v. Beck, supra, these matters may raise a strong pre-

sumption that the buyer's action on the warranty is not well founded, they are only evidence on a question of fact, and are not presumptions of law."

12. The Seller actually replaced one lot of 5,000 feet early in 1955.

13. The balance due from Buyer to Seller on purchase price was then approximately $4,286.67. Seller agreed to allow a credit of 10¢ a pound against all subsequent purchases to be billed at the regular contract rate of 66¢ per pound. Approximately $2,000 of such "credit" obtained from subsequent purchases was utilized to reduce the balance accordingly.

Buyer was not giving an assent to Seller's nonperformance.

Subsequent payments as well as the theoretical reconstituted zero balance of March 26, 1956, were likewise open to variable inferences. Both Seller and Buyer had what they thought was a profitable operation if the kinks could be worked out. A substantial portion of the tubing was satisfactory and payment was rightfully due for it. In addition other plastic products were being delivered for which payments were properly due. Seller treated it all as one account without ever exercising any right to distinguish between products, good or defective, or to reconstruct[14] the account as the law might have permitted.

Viewed in the light of Texas law, this was for the jury and its finding of nonwaiver is supported and binding.

### III.

While we thus hold that Buyer is entitled to a substantial setoff against the Seller's claim, we do not think that the amounts as fixed, note 4, supra, can be approved. The credits and the cash refunds include, as special damages, the retail profit which Buyer would have made. The replacements were stated (Issue No. 4) to be the manufacturer's sales price plus freight. But the amount was arrived at by the jury not on the basis of the Seller's sales price as such, but upon one arbitrary percentage factors representing operating or net profit after deduction of Buyer's overhead and the like.

 Here the Seller's contract, see note 2, supra, restricts liability for breach of warranty to the "seller's price list." Since the warranty is as to a condition which survives receipt and acceptance by the buyer, and there would be no opportunity for determining whether the goods complied until after receipt, the limitation of the "seller's price list" would not exclude the freight charges whether billed separately or not. The contract limitation is for "use" of the products and "use" does not commence until after receipt. A damage, e. g., freight payments, sustained prior to such time would be recoverable as in the ordinary course. Such a clause and construction is valid. For in Texas the parties to a contract may agree as to the remedy to be applied in case of breach, and it will be enforced by the Court so long as it is adequate and neither illegal nor in violation of public policy. Tennant v. Fawcett, 1900, 94 Tex. 111, 58 S.W. 824; Grindstaff v. Mather, Tex. Civ.App., 1945, 186 S.W.2d 364, 367, error refused w. o. m.; Frick-Reid Supply Corp. v. Meers, Tex.Civ.App., 1932, 52 S.W.2d 115, 119, no writ history; Magnolia Provision Co. v. Coleman, Tex. Com.App., 1928, 3 S.W.2d 412, 414; 37-A Tex.Jur., Sales, § 303 (1957).

### IV.

We find no error in the Court's dismissing that part of the Buyer's cross claim which sought damages for malicious prosecution from the use of an allegedly false affidavit in the attachment proceedings.

### V.

The result is that the judgment notwithstanding the verdict for Seller for the full unpaid balance as well as the denial of all recovery or offsets to Buyer on its cross claim must be set aside and the cause remanded for further consistent but limited proceedings. Open for determination as a credit against the admitted balance due the Seller is the amount, in money, representing Seller's list price (plus freight) for the quantities and amounts of tubing which the jury found in issues Nos. 6, 7 and 8 to have been replaced, or for which cash refunds or credits were made by Buyer

14. Indeed, the jury could consider that any such argument was all a lawyer's afterthought as the statement of account shows that credit memoranda presumably for the 10¢ credit, note 13, supra, were being given long after March 27, 1956. Under this September 1955 "settlement," these credits were against the $4,000 outstanding balance as of September 1955.

to its customers.[15] The Buyer shall be given full credit for such amount as an offset against Seller's unpaid balance or as an affirmative recovery on the cross-claim if in excess thereof.

Reversed and remanded in part.

HUTCHESON, Chief Judge (dissenting).

If I could agree that the answer of the jury to Special Issue No. 4 was authorized by the unconditional submission of that issue to it and was supported by evidence, I would certainly agree that, in setting the pattern for, and thereby strictly limiting, defendant's recovery by way of offset or counter claim, the majority has made a wise and just disposition of the cause and has given good and satisfactory reasons therefor.

Because, however, I am of the clear opinion that the district judge was right in entering judgment for plaintiff and against defendant, I respectfully dissent from the reversal of his judgment.

I base this opinion primarily on the jury's answer to Special Issue No. 1 and the undisputed evidence as a whole set out in part in the opinion of the majority which irrefutability establishes that defendant was not entitled to recover of plaintiff in offset or otherwise.

I base it, too, on the ground that in fact and in law the answers of the jury to Special Issues Nos. 4, 5, 6, 7, 8 and 9, on which the majority bases its opinion, were not responsive to, but were made in violation of, the court's instructions in this, that, in the submission of the case to the jury, Issues Nos. 1, 2, and 3 were unconditionally submitted for answer, while the remaining issues were submitted only upon this condition: "If you have answered the above special issues Nos. 1, 2, and 3, 'No', but not otherwise, then answer the next question", and the condition was not fulfilled because the answer to Special Issue No. 1 was "Yes".

15. See notes 4 and 5. The following illustrations will eliminate any doubt as to the limited nature of the determination to be made on remand.
Issue 6-Replacements:
Defendant and cross-plaintiff's Exhibit I includes the item:

| Date | Customer | Number | Size & Amount | Selling Price | Total |
|---|---|---|---|---|---|
| 4/6/56 | Brewer, R. T. Tahoka, Tex. | S.B. | 6" 420' | .26 | $109.20 |

The jury allowed approximately 60% of $109.20. On remand the credit will be limited to Seller's price list plus freight for that item.
Issue 7-Credits to Customers' Accounts:
Defendant and cross-plaintiff's Exhibit II includes this item:

| Date | Account | Record | Total |
|---|---|---|---|
| 4/21/56 | Tucker Farm Supply | CM 4078 | $1355.69 |

The jury allowed the full $1355.69. On remand the credit will be limited to the Seller's price list plus freight for that item.
Issue 8-Cash Refunds to Customers:
Defendant and cross-plaintiff's Exhibit III includes this item:

| Date | To | Check | Amount |
|---|---|---|---|
| 4/25/55 | J. E. Brooks | 2290 | $347.96 |

The jury allowed $347.96. On remand the credit will be limited to Seller's price list plus freight for that item.
In determining total amount for each category (Issues 6, 7 and 8), each item on Exhibit I, II and III will be separately computed. But all items of lay flat tubing listed on such Exhibits are accepted as final insofar as the date of sale, customer, number, size and amount of lay flat tubing and its defective condition are concerned.
No allowance is to be made for out-of-pocket losses covered by Issue No. 9 in the amount of $866.61.
And Buyer's credit shall be reduced by the amount of "settlement" credit memoranda (approximately $2,000) received, see note 13, supra.