Opinion delivered November 12, 1936.
Rehearing overruled January 13, 1937.

ED H. HARRELL, TRUSTEE, V. SUNYLAN COMPANY ET AL.
(H. C. SCHMIDT ET AL.)

No. 6755.   Decided November 12, 1936.
Rehearing overruled January 13, 1937.
(97 S. W., 2d Series, 686.)

*James B.* and *Charles J. Stubbs,* of Galveston, for plaintiff in error.

The ex parte petition of the property owners was not a contract but merely an invitation asking the city to plan, lay out and prepare specifications for a contemplated sewer system, from which the Schmidts were free to withdraw at any time prior to the making of a contract, and the subsequent making of a contract in which the contractor agreed to look only to the trustee for payment was an exclusion of the Schmidts from the contract, and a subsequent voluntary payment by the Schmidts to the contractor with full knowledge that contractor had been paid in full by the trustee, could not operate to divest the trustee of the rights which had already accrued to him. Galveston H. & S. A. Ry. Co. v. American Grocery Co., 122 Texas, 1, 36 S. W. (2d) 985; Wilson v. Dickson (Com. App.), 35 S. W. (2d) 701; National Bond & Mtg. Co. v. Davis (Com. App.), 60 S. W. (2d) 429; Hines v. First Guaranty State Bank (Com. App.), 243 S. W., 972.

*Fouts, Amerman & Moore, W. F. Carothers, Williams, Lee, Sears & Kennerly,* and *J. H. Painter,* all of Houston, for defendants in error.

MR. JUDGE GERMAN delivered the opinion of the Commission of Appeals, Section A.

This cause involves a contest over $1564.65 deposited with the City of Houston under circumstances hereinafter mentioned. The contenders for this fund are Ed H. Harrell, Trustee for the Sisters of Charity of the Incarnate Word, a corporation, on the one side, and Sunylan Company, a corporation, and W. R. Archer, its President, on the other. Harrell is plaintiff in error and will be referred to as Harrell. Instead of referring to the corporation represented by him, we will designate his beneficiaries as the Sisters of Charity. There is a further contest between Sunylan Company on one side and H. L. and F. C. Schmidt on the other. These latter parties will be referred to as the Schmidts. This contest concerns taxes for the year 1926 on property which the Schmidts conveyed to Archer, who in turn conveyed to the Sunylan Company. In the District Court of Harris County judgment was in favor of Harrell as trustee for the Sisters of Charity for the sum deposited with the City of Houston, and in favor of Sunylan Company against the Schmidts for $1940.13. The Court of Civil Appeals reversed the judgment in favor of Harrell, Trustee, and rendered judgment in favor of Sunylan Company and Archer for the fund held by the City of Houston. Having awarded this sum to Sunylan Company and Archer, under concessions made by them, the Schmidts were relieved from all liability. 69 S. W. (2d) 572.

The case is largely a fact case. The trial court made elaborate findings of fact. While the dissenting parties have submitted assignments attacking some of these findings, we find that in practically every instance they have failed to make a statement from the record showing wherein the findings are not correct. The Court of Civil Appeals did not overturn any of these findings, but differed with the trial court upon certain conclusions drawn from the facts. We may therefore safely be governed by the findings made by the trial court upon the facts. From these and from the record at large we will attempt to state in a faithful, concise, narrative form the material facts. The statement, however, must necessarily be lengthy.

The charter of the City of Houston has elaborate provisions for "Laying of Lateral Sewers by Property Owners." These sewers are generally referred to as "private lateral sewers."

In this case the sewer involved was found to be a private lateral sewer. It clearly appears that the purpose of these provisions is to permit property owners to construct sewers at their own expense, and to obtain connections with the sewer system of the City of Houston, but on the condition that such sewers must be constructed under the supervision and direction of the city engineer, to the end that they may become a proper correlated part of the general system. As a part of these provisions Section 1278 provides that any person who constructs an additional lateral sewer may obtain connection with a previously constructed lateral sewer by obtaining from the city council a permit to do so, and by depositing with the city "for the use and benefit of those who originally constructed or paid for connection with the lateral sewer which it is proposed by the applicant to run their sewer from, such sum, if any, as the city council may fix and declare to be reasonable, which said sum shall be by the city engineer distributed to the persons who have paid for or constructed the original sewer, in proportion to the amount paid by such persons for the construction or on account of connection therewith."

In the year 1925 the Sisters of Charity, who owned a block of valuable property situated adjoining Lawndale Avenue, about one mile from Telephone Road, became desirous of having a lateral sewer laid along Lawndale Avenue to the boundary of their property. Ed H. Harrell became interested in aiding them to obtain this sewer. To this end he circulated a petition among the owners of property abutting on Lawndale Avenue, and obtained the signatures of some of these signers, but not all. Among those who signed the petition were the Schmidts, who owned abutting property with a frontage of 823.3 feet. This petition was addressed to the City Council of the City of Houston and had for its purpose the obtaining of the City's cooperation in laying out and supervising the construction of this lateral sewer from Telephone Road along Lawndale Avenue to Wayside Drive, which appears to be the eastern boundary of the property belonging to the Sisters of Charity. There were provisions in the petition advising the City that the cost of the sewer was to be borne by the owners of abutting property in proportion to the amount of frontage owned by each. In response to this petition the city council on August 10, 1925, passed a resolution authorizing the city engineer to do all engineering and inspection necessary in the construction of the sewer; "the property owners to enter into private contract for the construction of the sewer." The City advertised for bids

and entered into a formal contract with E. K. High for the construction of this sewer. While the contract bears date September 24, 1925, it was not formally accepted by the City until September 30, 1925. Apparently this contract was on the usual printed forms used by the City in making sewer contracts, and purported to bind the City for payment of the cost of the improvement. However, at about the same time E. K. High executed an instrument which, after reciting the making of the contract, contained the following provision: "I do hereby acknowledge that I understood and still understand that the reason for the making of the contract and the signing of same by the City of Houston was for the sole purpose of having such work done under the supervision of the City Engineer and according to the plans and specifications prepared by such Department, and requirements of said City, and that the City is to pay no part of the expenses of the construction of said sewerage line, but that same is to be paid for by the private individual property owners whose property lies adjacent to and abutting said Lawndale Avenue, and for whom Mr. Ed. Harrell of Houston, Texas, is Trustee."

Pending negotiations leading up to the execution of the contract by the City, Harrell and High, in order to make provision for payment of costs of the sewer by abutting owners, undertook to interview each of such owners and get them to enter into contracts, secured by lien, covering costs of their proportionate parts. Prior to August 8, 1925, Harrell had seen some of these parties and had procured their agreements, while High had seen others. When he interviewed the Schmidts these parties advised him that they were not further interested in the matter and they would not sign any contract. On September 8, 1925, he addressed a letter to Harrell, advising him of the status of affairs with reference to the project. Such letter listed property owners with whom Harrell was to make agreements. It listed further the names of property owners who had signed contracts. It listed names of those whom he thought would sign in a day or two. It then contained a statement as follows: "The following absolutely refused to sign—Henry & A. F. Schmidt * * * Frontage 823.3 * * * Amount $1312.21."

Immediately following these names was the following notation: "Of the above no one but Henry & A. F. Schmidt signed the original petition. They say at this time that they will not sign, or are they interested in paying any amount." All this was before contract was consummated, and before any work was done.

On the day after execution of the formal contract with the City High entered into partnership with E. E. Clancy and W. D. Warfield, such arrangement being for the express purpose of carrying out this contract along with other similar contracts. Clancy was to have charge of the office and accounts, taking care of collections, remittances, etc., while High was to be general superintendent of all construction work.

About the time the work on the sewer began, or shortly thereafter, it developed that on account of the Schmidts and some others having failed to sign contracts a deficit of $2052.24 existed between the funds available and the contract price. For this and probably other reasons High refused to proceed with the work. Harrell was therefore confronted with the contingency that if he failed to guarantee this deficit, the purpose which prompted the initiation of the project, to wit: obtaining sewer facilities for the property of the Sisters of Charity, would be entirely defeated. High had requested Harrell to guarantee the deficiency. On November 5, 1925, Harrell wrote High guaranteeing the payment of $8475.58, which included the deficit of $2052.24. In order to secure himself, so far as the sum of $2052.24 was concerned, Harrell solicited contributions from his friends and friends of the Sisters of Charity; and these friends responded by contributing said sum of $2052.24 for the benefit of the Sisters of Charity.

The trial court found that High, or the partnership which took over the contract, was paid in full. The last payment was made by Harrell to High by check dated December 2, 1927, and bore the following indorsement:

"This check is given to and accepted by E. K. High, Contractor, as payment in full of any and all demands of which he may have been entitled to under one certain contract entered into with the City of Houston under date of September 22nd 1925, covering the laying of a sanitary sewer in the City of Houston on Lawndale Avenue from Telephone Road to Wayside Drive. Also is to cover any and all guarantees that may have been made by Ed. H. Harrell personally to said E. K. High, regarding the payments of certain sums of moneys account of said sewer."

It is true that this endorsement and some of the receipts given to Harrell were signed by Clancy on behalf of High and the High Construction Company, and defendants in error have by assignments questioned the right of Clancy to bind High. The trial court found that Clancy had a right to receive and receipt for the money. The assignments presenting the ques-

tion of the authority of Clancy are not supported by a statement from the testimony sufficient to overcome the finding of the trial court; and in addition the trial court was the judge of the credibility of witnesses, and had a right to disregard the testimony of High, which was principally relied upon by defendants in error. Furthermore, this question is not of controlling importance, as will hereinafter be seen.

The trial court found that the subscription fund of $2052.24 was for the sole benefit of the Sisters of Charity, and that this fund was specifically applied by Harrell to the payment of the deficiency brought about by the withdrawal of the Schmidts and others, and that as to that portion of the sewer constructed in front of the property formerly belonging to the Schmidts, Harrell, as trustee for the Sisters of Charity, was as a matter of fact and in law and equity the "person who originally constructed or paid for same," within the purview of Section 1278 of the city charter.

On January 1, 1926, the Schmidts deeded their property fronting on Lawndale Avenue to the Sunylan Company. Prior to this conveyance Harrell notified W. R. Archer and other officers of the Sunylan Company that he had paid High in full for constructing the sewer in front of the Schmidts' property and expected to look to the Schmidts or to the Sunylan Company as their assignee for a refund or payment of the amount apportioned to that property. He further advised them that he would oppose any connection by Sunylan Company with the sewer until the amount was paid. The Schmidts were also advised of these things.

For some reason, E. K. High on September 23, 1927, sued the Schmidts to recover their proportionate part of the cost of constructing the sewer, on the theory, we assume, that the original petition to the City constituted a binding and irrevocable contract to pay. On February 12, 1928, the Schmidts settled this suit out of court by paying High $1200.00; in consideration of which High transferred his right, title and interest in the sewer to the Schmidts. After acquisition of the Schmidts' property the Sunylan Company paid the taxes for the year 1926 and later sued the Schmidts on their warranty of title to recover the amount of such taxes. This suit was settled by an agreement on the part of Sunylan Company to waive the tax lien, on consideration that the Schmidts would procure a connection with the Lawndale Avenue sewer for the use and benefit of Sunylan Company's property. The manner of obtaining such connection was left to the discretion of the

Schmidts and their attorney. The Schmidts never procured this connection. At one time it appears that the Sunylan Company was given permission to make the connection, but shortly thereafter, on being advised that Harrell was claiming the right to be compensated before the connection was made, the city council withdrew the permission for connection and entered an order requiring satisfaction to be made with Harrell before connection would be allowed. Apparently, after purchase of the Schmidts' property the Sunylan Company sub-divided same and improvements were made thereon. Relying upon the agreement of the Schmidts to obtain sewer connection, the Sunylan Company permitted use of sewer facilities within the Addition, and it claims that this created a sanitary condition requiring prompt action on its part for obtaining a connection with the Lawndale sewer. At any rate, on March 21, 1928, the Sunylan Company made deposit of the sum of $1564.65 with the City, as required by Section 1278 of the charter and by the order of the city council, and received a permit to connect with the sewer. The trial court found that this payment was voluntarily made, but accompanied with a letter of protest.

Now, with reference to the right of Sunylan Company to recover this deposit, the defendants in error take the position that the petition signed by the Schmidts which initiated the proceeding for construction of the sewer, so far as the City was concerned, constituted an irrevocable offer to pay their proportionate part of the cost of construction, which matured into a contract, from which they could not withdraw. They further contend that the Schmidts having paid High the sum of $1200.00 in settlement of High's suit and having taken an assignment from High they became entitled to a connection with the sewer as a matter of law, and the City had no right to require of Sunylan Company the deposit of $1564.65. The Sunylan Company contends, therefore, that although it made the deposit, it did so under protest and was entitled to have same refunded to it as its money.

■ The Court of Civil Appeals appears to have disposed of this phase of the case on the theory alone that the petition which was signed by the Schmidts "became and is a binding contract on the part of the Schmidts from which they could not withdraw." With this holding we cannot agree. While the petition contains language which purports to constitute a promise to pay, nevertheless all the circumstances show that this language was purely formal, and that the petition was solely for the purpose of invoking the City's aid in supervising

the construction of the sewer. High never considered that the City was an agent for him in making contracts for payment. In the instrument of September 22, 1925, he expressly stated as follows: "I do hereby acknowledge that I understood and still understand that the reason for the making of the contract and signing of same by the City of Houston was for the sole purpose of having said work done under the supervision of the city engineer, and according to plans and specifications prepared by such department and requirements of said City." The City did not understand that it was acting for any one in making contracts. In the resolution of August 10, 1925, the city council authorized the city engineer to do all engineering and inspection necessary, but added this significant language: "The property owners to enter into private contracts for the construction of the sewer." In the instrument of September 22, 1925, High declared that no part of the expense was to be paid by the City, but that same was to be paid by "the private individual property owners whose property lies adjacent to and abutting said Lawndale Avenue, and for whom Mr. Ed. Harrell of Houston, Texas, is Trustee." The trial court found that Harrell was never trustee for the Schmidts, and did not represent them. This finding is amply supported by the proof. In addition it is evident that High did not regard the petition as an offer and its acceptance by the City as constituting a contract. During the proceedings leading up to the signing of the formal contract he and Harrell were active in trying to get contracts signed by the property owners. High himself interviewed the Schmidts, and in his letter of September 8, 1925, he advised that they had absolutely refused to sign any contract; that they did not want to have anything further to do with the matter, and that they would not pay any part of the cost. This was long before the work was begun. If High had been relying upon the petition as a binding contract he would have gone forward with the work; notwithstanding this action on the part of the Schmidts. He did not do so, but refused to do the work without a guarantee from Harrell. The guarantee was obtained and the laying of the sewer in front of the Schmidts' property was apparently done solely in reliance on this guarantee. Harrell seemingly kept High fully advised, and the latter must have known that the subscriptions made by friends of the Sisters of Charity was for the sole purpose of making good Harrell's guarantee of the deficit. The trial court found that the fund raised by subscription was "specifically

applied by Harrell to the payment of the deficiency brought about by the withdrawal of the Schmidts and others."

■■ The trial court concluded that "the Schmidts by their withdrawal in limine from the enterprise and by their refusal to pay any part of the cost of constructing the sewer, waived any rights or privileges they might have had to take part in the construction of the sewer; and that by such withdrawal and by their refusal to take part therein and by their inaction while the sewer was being constructed and paid for by Harrell and those whom he represented, they were estopped to claim any right or interest in derogation of Harrell's right in the premises." This conclusion seems to be justified by the proof. At any rate, we think it obvious that High had no enforceable contract with the Schmidts, and the settlement by agreement of the suit which he brought against the Schmidts and the payment of only $1200.00, did not entitle the Schmidts or the Sunylan Company to connection with the sewer. The Schmidts before making this settlement were fully advised of the claim of Harrell that he had paid High in full. They must have known that their liability to High (even if High had not been fully paid) was extremely doubtful, to say the least. The agreed settlement with High out of court was at their peril. We therefore conclude that Sunylan Company had no right to recover back this deposit, which was in reality the only true consideration for the connection obtained by them with the Lawndale Sewer.

■ Although the City apparently first recognized the right to a connection, it later withdrew such right and required a deposit equal to the amount claimed by Harrell. It did not, however, pay the amount to Harrell, and in effect invited this suit as a stakeholder. The action therefore partakes largely of the nature of an interpleader suit. In such cases equitable principles govern to a great extent. As Sunylan Company has no legal or equitable right to the fund in question it cannot justly object to a recovery by Harrell as trustee. We think, however, that it was amply shown, as found by the trial court, that Harrell, as trustee for the Sisters of Charity, is equitably and justly entitled to this deposit. This being true, no harm could result by allowing an amended pleading by Harrell as trustee for the Sisters of Charity.

■ With reference to the judgment of the trial court in favor of Sunylan Company against the Schmidts but little additional

need be said. The suit filed by Sunylan Company and Archer against the Schmidts was settled by an agreement that the plaintiffs in said suit would waive their tax lien, on consideration that the Schmidts would obtain a connection with the sewer. The effort of the Schmidts to obtain this connection by paying High $1200.00, under the conditions above enumerated, was futile. We have held that this did not entitle them to the connection. They seem to have wholly defaulted after failing to obtain a connection by the settlement with High. We are of the opinion that there was a clear breach of their obligation. They appear to defend, however, upon the ground that the payment by Sunylan Company of the deposit was voluntary. Whatever view we may take of this payment so far as Harrell is concerned, it is evident it was not voluntary so far as the Schmidts were concerned. The trial court found that the Sunylan Company relying on "the assurances of the Schmidts that the connection had been arranged for, connected the sanitary sewers in its Addition, and they were in use and serious sanitary difficulties were threatened if such connection was not made." Under such circumstances, the Schmidts cannot avoid the breach of their obligation by claiming a voluntary deposit on the part of Sunylan Company. The judgment awarded Sunylan Company was less than the amount of taxes which they had paid, plus interest, and we think the trial court properly awarded such judgment.

The judgment of the Court of Civil Appeals is reversed and the judgment of the trial court is in all respects affirmed.

Opinion adopted by the Supreme Court November 12, 1936.

Rehearing overruled January 13, 1937.