**In the Interest of A.V.**

**No. 2–92–099–CV.**

Court of Appeals of Texas,
Fort Worth.

Feb. 10, 1993.
Rehearing Overruled March 30, 1993.

Charles S. Leeper, Brett J.· Wyatt, Fort Worth, for appellant.

Janice A. Schattman, Sandra K. Houston, Fort Worth, for appellee.

Before LATTIMORE, WEAVER and HARRY HOPKINS (Retired, Sitting by Assignment), JJ.

## OPINION

HOPKINS, Justice (Retired).

In this post-divorce proceeding, Thomas V. appeals the termination of his parental rights with his daughter, A.V., born June 15, 1984.[1]

We affirm.

In four points of error appellant contends: there was not clear and convincing evidence to justify termination; testimony concerning results of a penile plethysmograph test was improperly admitted; and a court-appointed psychologist should have been permitted to testify, even though appellant had not listed the witness in answers to interrogatories.

A.V.'s parents are both therapists; appellant has a master's degree in psychology, and appellee has a Ph.D. in psychology. They were married in 1973, and their daughter, A.V., was born on June 15, 1984. The parties were divorced on May 12, 1987, and appellee was appointed managing conservator of their daughter, A.V., who was then almost three years old. In June 1989, appellee filed a petition seeking to terminate appellant's parental rights, alleging appellant had sexually abused A.V., which conduct endangered the physical and emotional well-being of the child. *See* TEX. FAM.CODE ANN. sec. 15.02(1)(E) (Vernon Supp.1993).

After a bench trial, the court found that appellant had engaged in conduct that endangers the physical and emotional well-

---

1. Throughout this opinion we will refer to A.V.'s father, Thomas V., as appellant, and to A.V.'s mother, Susan V., as appellee.

being of the child, and that termination of the parent-child relationship between appellant and A.V. is in the child's best interest. Appellant's parental rights were terminated, and the court ordered that appellee remain as sole managing conservator. No findings of fact or conclusions of law were requested or filed.

■ Appellant's second and third points of error address the admission into evidence of testimony of a social worker, John Brogden, concerning his interpretation and conclusions based on the results of a penile plethysmograph test which was administered to appellant in August 1989 by Robert Powitzky, Ph.D. Dr. Powitzky's two-page report was offered into evidence by appellee, and admitted without objection, as a part of the case file maintained by the Child Protective Services division of the Texas Department of Human Services. Dr. Powitzky did not testify at trial.

Appellee called as a witness John Brogden, a supervisor of a sexual abuse unit with Child Protective Services. Brogden is a certified social worker in the State of Texas, and holds a master's degree in Science and Social Work. He testified that since 1976 he has held many jobs in which he attempted to rehabilitate accused sex offenders. He never interviewed or tested appellant, but stated that he was familiar with the pending investigation concerning alleged abuse of A.V. by appellant. Brogden explained that when he works on a case, he routinely uses a psychologist's interpretative test results of various tests which the psychologist has performed upon the patient, including a penile plethysmograph. Brogden testified that in his practice he uses the results of a penile plethysmograph to evaluate the absence or presence of deviant arousal in a patient, and to measure whether someone is making progress in treatment.

The following is Brogden's description of how a penile plethysmograph is performed:

Basically it's a plastic tube generally. It feels very sensitive metallic substance such as mercury perhaps with cable coming off that. It goes around the man's penis. It runs in the computer software and various designs and then different stimuli are shown to the individual visually and generally orally listen to audio tapes and watch slides and calibrations, et cetera are quite complicated actually, but the bottom line is to test arousal and see what someone is turned on to and what they're turned off to.

Over appellant's objections, appellee was permitted to question Brogden about his interpretation of the penile plethysmograph which Dr. Powitzky had performed upon appellant. In his report, Dr. Powitzky stated that appellant had been referred to him by appellant's attorney, who requested an evaluation of appellant's personality, specifically regarding allegations of sexual abuse. Dr. Powitzky performed five evaluation techniques: clinical interview; Minnesota Multiphasic Personality Inventory (MMPI); Millon Clinical Multiaxial Inventory (MCMI); Multiphasic Sex Inventory (MSI); and Penile Plethysmograph. Dr. Powitzky listed various facts concerning appellant's personal and professional background.

The following portions of Dr. Powitzky's report are relevant to appellant's contention that John Brogden should not have been permitted to testify about Brogden's interpretation of the test results of appellant's penile plethysmograph:

EVALUATION RESULTS:

The results of the psychological inventories and clinical interview indicated that [Thomas V.] is experiencing agitated depression, probably situationally related. He stated that the most stressful part of his situation is that he has always been in positions of trust and helping, and now professional colleagues question his honesty and behavior. There were no indications of sexual pathology.

The Multiphasic Sexual Inventory also revealed no indications of sexual problems. Tom scored in the normal range of social sexual desirability and of sexual knowledge. **The plethysmography data revealed no significant arousal to any of the stimuli. His highest individual score was to adult females. Although his actual arousal was not significant,**

he self-reported moderate arousal only to adult females.

....

SUMMARY:

The results of [Thomas V.'s] evaluation revealed no sexual or psychological pathology. He was exhibiting acute agitated depression, as a result of the current situation. **The plethysmography data revealed no deviant arousal pattern; moreover, there was no significant arousal to any age/sex group. There was a slight, though not significant, trend only for adult females.**

In conclusion, no psychosexual evaluation can prove or disprove guilt of any act; however, there were none of the indicators of sexual abuse patterns that one would expect. This evaluation is offered as one component of the overall decision making process. [Emphasis added.]

Appellant did not object either at trial or on appeal to the introduction into evidence of Dr. Powitzky's report; therefore, we will not address the admissibility of the written report. However, appellant did object that Brogden's interpretation of the penile plethysmograph administered by Dr. Powitzky was inadmissible hearsay, and that appellee had not established any predicate for Brogden to testify about a test that he had not conducted. Appellant further objected that the reliability of a penile plethysmography had not been shown. Although the trial judge stated "I do have some concerns about that exam. I really do," she found Brogden's testimony was admissible under TEX.R.CIV.EVID. 703, and overruled appellant's motion to strike the complained of testimony or alternatively to grant a mistrial.

Because appellant did not object to the prior introduction into evidence of Dr. Powitzky's report which discussed the results of appellant's penile plethysmography, we find appellant has waived any complaint regarding subsequent testimony about these test results. *See Posner v. Dallas County Child Welfare*, 784 S.W.2d 585, 587–88 (Tex.App.—Eastland 1990, writ denied) (per curiam) (no error preserved in termination suit where evidence complained of was contained in a psychological evaluation which had been previously admitted without objection); *Port Terminal R.R. Ass'n v. Richardson*, 808 S.W.2d 501, 510 (Tex.App.—Houston [14th Dist.] 1991, writ denied) (appellant had waived right to challenge subsequent introduction of same evidence); TEX.R.CIV.EVID. 103(a)(1). Accordingly, if Brogden qualifies as an expert witness his interpretation of the test results was admissible.

The Texas Rules of Civil Evidence provide:

**RULE 702. TESTIMONY BY EXPERTS**

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

**RULE 703. BASES OF OPINION TESTIMONY**

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or reviewed by the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

TEX.R.CIV.EVID. 702 and 703.

Preliminary questions concerning the qualification of a person to be a witness shall be determined by the court, which is not bound by the rules of evidence except those with respect to privileges. TEX. R.CIV.EVID. 104(a). A witness who, by his or her knowledge, skill, experience, training, or education has specialized knowledge that will assist the trier of fact in understanding the evidence or determining a fact in issue may express an opinion about the matter. *Celotex Corp. v. Tate*, 797 S.W.2d 197, 201 (Tex.App.—Corpus Christi 1990, no writ); *Marling v. Maillard*, 826 S.W.2d 735, 739 (Tex.App.—Houston [14th Dist.] 1992, no writ). There

are, however, no definitive guidelines for determining the knowledge, skill, or experience required of a particular witness when testifying as an expert. *Celotex*, 797 S.W.2d at 201. The trial court's decision regarding the qualification of an expert will only be disturbed upon a finding that the court abused its discretion. *Id.; De-Leon v. Louder*, 743 S.W.2d 357, 359 (Tex. App.—Amarillo 1987), *writ denied per curiam*, 754 S.W.2d 148 (Tex.1988).

Brogden testified he was quite familiar with the literature on the penile plethysmograph, and that experts in the area of sexual abuse of children rely upon the test to look at sexual arousal. The test tells whether the patient is trying "to dissimulate or lower their arousal." Brogden stated that he had read Dr. Powitzky's two-page report, and was furnished by counsel with the raw data on thirty-two slides of the penile plethysmograph.[2]

Brogden was asked about his opinion that he found an internal inconsistency between appellant's statement to Dr. Powitzky that appellant has a great sex life, and the results of the penile plethysmograph which indicate a low flat arousal pattern by appellant. The following dialogue ensued:

[ATTORNEY AD LITEM:]

Q Okay. I need for you to explain to me again why there is an inconsistency in the report that Dr. Powitsky [sic] did?

A A person that's taking a test honestly you will find congruence between the verbal statements about their sexual lives and also the plethysmograph results.

In other words the person honestly taking the test will have very similar results. If an individual says I'm primarily interested in adult women, they will find that a significant interest in adult women on the test.

What I find interesting in this one is: I'm having a great sex life. I'm really into women sort of thing. Yet on the test we find basically no significant arousal to any stimuli and no significant difference amongst the stimuli. In other words a low flat pattern.

Q All right. And it's your testimony that those kinds of facts that are reported in this report are consistent with someone who is not telling the truth?

A It can be consistent with that, but there is another thing that's often seen in literature. There are two things that are seen in literature. One is the person try [sic] to dissimulate the results. In other words to not peak out. In other words look bad on the test, but the pattern is decreased. Generally so it's a low flat pattern. The person is messing with the test.

Second possibility that is referred to in the literature is particularly targeted incest and that is a common pattern in incest. Very common. This is, in fact, the most common plethysmograph pattern with incestuous offenders.

In other words they're not primarily interested in children. One of the major problem is their sexual interest in adult women is too low. So there is very little discrimination when it comes to children and adults. So their preference is certainly not children, but when push comes to shove and things are going bad in life, a kid will do.

Q Okay. And that's what you're seeing here?

A I'm seeing—

Q One of the two?

A I think it's one of the two.

When asked about Dr. Powitzky's conclusion that the plethysmography data revealed no deviant arousal pattern in appellant, Brogden stated he disagreed with this conclusion and the test does reveal such a pattern. He said:

If these test results are correct. If there is no dissimulation here, if these are accurate readings on this individual, you have a man in my opinion that needs a lot of help. He must have number one a lower increase arousal to adults definitely. No doubt about that. If this is an honest test. All right. Then I would want to see some lowering of the arousal to children.

---

**2.** Neither the raw data nor the thirty-two slides were introduced into evidence.

Both parties agree there are no Texas cases dealing with the admissibility of a penile plethysmograph. As stated earlier in this opinion, inasmuch as Dr. Powitzky's report was admitted into evidence without objection we will not address the admissibility of the report. With regard to Brogden's qualification as an expert witness, Brogden holds an advanced degree in Science and Social Work. More importantly, he testified that for many years his job has consisted of attempting to rehabilitate accused sex offenders. In this capacity, Brogden routinely used the results of the penile plethysmograph to evaluate a client's progress. Having reviewed the record we are unable to say the trial court abused its discretion in determining that Brogden qualified as an expert witness, particularly in the absence of an appropriate objection. *See Swearingen v. Swearingen,* 578 S.W.2d 829, 832 (Tex.Civ.App.—Houston [1st Dist.] 1979, writ dism'd) ("trial court had ample justification to allow the opinion testimony, particularly in the absence of an appropriate objection").

Further, we disagree with appellant that appellee had the burden of establishing the reliability of the penile plethysmograph before Brogden could testify concerning his interpretation of the test. Although ordinarily the proponent of the scientific test would have to establish its reliability prior to the test results being admissible, *Gannett Outdoor Co. of Texas v. Kubeczka,* 710 S.W.2d 79, 89 (Tex.App.—Houston [14th Dist.] 1986, no writ), TEX.R.CIV. EVID. 702 and 703, in the instant case the test results were already in evidence; therefore, appellee was not required to prove the reliability of the test prior to Brogden testifying about the test. Accordingly, we overrule appellant's second and third points of error.

█ Nevertheless, appellant's first point of error challenges the sufficiency of the evidence to support the termination of his parental rights. We find the reliability of a penile plethysmograph *is relevant to the weight to be given* the conclusions in Dr. Powitzky's report, and to Brogden's interpretation of the test.

Responding to questions from the attorney ad litem, Brogden testified regarding the reliability of the test results as follows:

Q   What is your opinion, if you have one, about whether or not the arousal pattern that shows on a plethysmograph is controllable at will by the patient?

A   Plethysmograph is perhaps the most manipulable test because someone who is of high intelligence and does some reading you can figure out real easily how to lower arousal. It's not difficult to do.

Q   All right. So would it be fairly easy for someone who is quite educated and intelligent to have a flat pattern if they wanted to?

A   Oh, yes. But there is a distinction there. What happens when people are dissimulating is they lower the arousal but not necessarily change the pattern. That's what's most informative.

In support of his contention that Brogden's testimony about the test results of the penile plethysmograph was inadmissible, appellant directs us to several out-of-state criminal cases which comment upon the admissibility of such a test. *See People v. Ruiz,* 222 Cal.App.3d 1241, 272 Cal. Rptr. 368, 370 (1st Dist.1990), (citing *People v. Stoll,* 49 Cal.3d 1136, 265 Cal.Rptr. 111, 783 P.2d 698, 713 n. 21 (1989); and *State v. Ambrosia,* 67 Ohio App.3d 552, 587 N.E.2d 892, 898 (6th Dist.1990)). Appellee relies upon another out-of-state criminal case, *Commonwealth v. Rosenberg,* 410 Mass. 347, 573 N.E.2d 949, 954 (1991). Unfortunately, none of the cited cases directly addresses the admissibility of a penile plethysmograph.

Both *Ruiz* and *Stoll* dealt with the admissibility of evidence regarding test results from an MMPI and MCMI, not a penile plethysmograph. *Ruiz,* 272 Cal. Rptr. at 370; *Stoll,* 783 P.2d at 713. In a footnote in *Stoll,* the court distinguishes a case relied upon by the dissent in *Stoll, People v. John W.,* 185 Cal.App.3d 801, 229 Cal.Rptr. 783 (1st Dist.1986), by stating that a psychologist's examination of a criminal defendant in *John W.* was inadmissible because it consisted of three components,

one of which was "two administrations of an electronic physiological test known as a penile plethysmograph." *Stoll*, 783 P.2d at 713 n. 21. The *Stoll* court commented that the appellate court in *John W.* held that testimony regarding the plethysmograph was properly excluded. *Id.*

In the third criminal case cited by appellant, *State v. Ambrosia*, the defendant challenged the trial court's refusal to admit into evidence the results of a penile plethysmograph. *Ambrosia*, 587 N.E.2d at 898–99. The appellate court did not address the contention because it found the defendant failed to preserve error as he never attempted to introduce the test results into evidence. *Id.* at 899.

In the case cited by appellee, the criminal defendant complained of the trial court's instruction to the jury regarding the results of a penile plethysmograph. *Commonwealth*, 573 N.E.2d at 954. The judge instructed the jury that the opinion of the defense expert that the defendant was not mentally ill and was not dangerous by reason of mental illness, was based "to a great degree" on the results of a penile plethysmograph examination, which, the judge told the jury, was not commonly used, but which has a "fair degree of reliability." *Id.* at 952, 954. The defendant claimed that the judge essentially told the jury it could discount the expert's testimony. *Id.* at 954. The appellate court found no error, opining:

> Review of the trial transcript reveals that, while the results of the plethysmograph test may not have had great significance in [the witness'] over-all evaluation of the defendant, the results were a basis of his opinion as to the defendant's sexual orientation. The transcript reveals that the judge clearly and extensively instructed the jury that they, not the judge, were the ultimate fact finders

who determined what weight and effect to give testimony. There was no error. *Id.* at 955.

None of the cited cases directly supports the arguments of either party in the case at bar regarding the weight we should place upon the conflicting expert opinions interpreting the penile plethysmograph which Dr. Powitzky administered to appellant. We recognize that the trier of fact is the judge of the credibility of the witnesses. *See Bellefonte Underwriters Ins. Co. v. Brown*, 704 S.W.2d 742, 744–45 (Tex. 1986); *Harrell v. Sunylan Co.*, 128 Tex. 460, 97 S.W.2d 686, 689 (1936). However, although Dr. Powitzky's and Brogden's opinions concerning the test were admitted before the trial court, we find little, if any, testimony was presented showing the reliability of this type of test. *Cf. People v. John W.*, 229 Cal.Rptr. at 783 (although there was considerable and conflicting testimony about reliability in the scientific community of the penile plethysmograph, the test results were properly excluded).

In the instant case, we have grave reservations whether appellee has established that the penile plethysmograph is a reliable test of a person's alleged sexual deviancy, and whether such a test is generally accepted in the scientific community as a valid indicator of sexual preferences or disorders. There was no medical testimony presented on the issue of reliability, and Brogden himself admitted that a person of high intelligence who does some reading can easily manipulate the results of the penile plethysmograph. Based upon the record before us, we are unable to conclude that appellee has established the reliability of the penile plethysmograph. Therefore, in our review of the sufficiency of the evidence to support the judgment we will not place any weight upon any evidence regarding the results of the penile plethysmograph that was administered to appellant.[3]

---

**3.** Appellant also compares the unreliability of a penile plethysmograph with a polygraph, the results of which are not admissible into evidence in civil suits in Texas. *See Bufkin v. Texas Farm Bureau Mut. Ins. Co.*, 658 S.W.2d 317, 322 (Tex.App.—Tyler 1983, no writ); *Pierson v. McClanahan*, 531 S.W.2d 672, 676 (Tex. Civ.App.—Austin 1975, writ ref'd n.r.e.). In view of our holding that we will not consider any testimony regarding the penile plethysmograph, we need not discuss this aspect of appellant's argument.

■ In his first point of error, appellant contends the trial court erred in terminating appellant's parental rights to A.V. because there was not clear and convincing evidence presented.

The natural right existing between parents and their children is of constitutional dimension. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985). The rights to conceive and raise one's own children have been deemed "essential," "basic civil rights of man," and "far more precious.... than property rights." *See Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 558 (1972). A termination decree is complete, final, irrevocable and divests for all time that natural right as well as all legal rights, privileges, duties and powers with respect to each other except for the child's right to inherit. *Holick,* 685 S.W.2d at 20.

■ In proceedings to terminate the parent-child relationship brought under TEX. FAM.CODE ANN. sec. 15.02 (Vernon Supp.1993), the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must additionally prove, as required under subdivision (2), that termination of the parent-child relationship is in the best interest of the child. *Richardson v. Green,* 677 S.W.2d 497, 499 (Tex.1984). Both elements must be established and proof of one of the two elements does not relieve the petitioner of the burden of proving the other element. *See Holley v. Adams,* 544 S.W.2d 367, 370 (Tex.1976); *Wiley v. Spratlan,* 543 S.W.2d 349, 351 (Tex.1976). Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by "clear and convincing evidence." *In the Interest of G.M.,* 596 S.W.2d 846, 847 (Tex.1980). This standard is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* Termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent. *Holick,* 685 S.W.2d at 20–21.

■ No findings of fact or conclusions of law were requested or filed. In a trial to the court where no findings of fact or conclusions of law are filed or requested, the judgment of the trial court implies all necessary findings of fact in support thereof. *In the Interest of W.E.R.,* 669 S.W.2d 716, 717 (Tex.1984) (per curiam); *Burnett v. Motyka,* 610 S.W.2d 735, 736 (Tex.1980) (per curiam). An appellant may challenge these implied findings by raising both legal and factual sufficiency of the evidence points, and where such points are raised, the standard of review to be applied is the same as that to be applied in the review of jury findings or a trial court's findings of fact. *Burnett,* 610 S.W.2d at 736.

The divorce decree basically provided that A.V. would spend every other night with appellant, and both parties testified they adhered to this schedule. Appellee stated that in March or April of 1988, A.V. began displaying some behavioral symptoms that concerned appellee. The child began to have stomach aches, seemed withdrawn ("robot like"), and had nightmares. Appellee discussed these symptoms with appellant, but he said he thought A.V. was fine. In May or June of that year A.V. began to beg appellee not to make her spend the night with appellant. She began complaining about her "pee pee" hurting, she started wetting the bed, her nightmares increased, she talked baby talk, and sucked her thumb even more. Additionally, A.V. began to frequently masturbate in front of appellee and other adults.

A.V. told appellee that she was scared of spending the night with her daddy, but would not tell her mother the reason for her fear. On the nights she visited appellant, A.V. usually telephoned her mother and would be crying hysterically and beg her mother to come and get her because she was scared and afraid. Although A.V. pleaded with her mother not to make her stay, appellee said she never went over to appellant's to pick up A.V. Appellee testified that these symptoms continued throughout 1988, and escalated in terms of

A.V. protesting about spending the night with appellant. One time when appellee brought A.V. to appellant's house for a visit, A.V. was hiding in the space between the front and back seats of appellee's car, crying hysterically, and had to be pried out of the car. The only testimony from appellee relating to A.V.'s outcry on June 29, 1989 is that appellee and A.V. were watching television on that date when A.V. started pulling on her panties and crying, and saying her pee pee hurt bad. Appellee took A.V. to a local hospital emergency room, where doctors attempted to perform a rape exam, but apparently were unable to complete the exam.

Melanie Cleveland, a child protective service specialist with the Texas Department of Human Services, interviewed and videotaped A.V. the next day. In this videotape A.V. said that when she visits her daddy, he makes her take a bath and touches her pee pee, and it hurt when he touched her. Her daddy used one finger when he touched her pee pee. A.V. first said this happened only once, but later in the interview she stated it happened three or four times and that sometimes this also occurred on his bed. Her daddy was always dressed when this happened, he never touched her bottom, never put anything inside her pee pee, never asked her to touch his pee pee [4], and she always slept in her own bed. Her daddy told her not to tell, or her mommy would get mad.

At trial, Cleveland stated that "pee pee" and "bottom" are fairly typical terms that a child would use. She believed that A.V.'s language in describing the events was consistent with a valid outcry, and she saw no indication that this was a programmed story.

On September 13, 1989, A.V. was examined at the Children's Hospital in New Orleans, Louisiana by Helen Britton, M.D., a specialist in child behavior and development and child abuse. Dr. Britton testified by deposition that she interviewed A.V. and then did a physical examination including use of a colposcope, a machine which magnifies (15x) and photographs the patient's genital area. During the interview, A.V. said her daddy touches her pee pee in the bathtub and in the bedroom; Dr. Britton stated she did not believe A.V. was coached or programmed. Dr. Britton's physical examination of A.V.'s genital area revealed that she had a labial adhesion, which in Dr. Britton's opinion was consistent with A.V.'s description of what happened to her. When asked whether she had an expert opinion as to whether A.V. had probably been sexually abused in some fashion, Dr. Britton responded "Yes. I would have quite a bit of concern that the child had been sexually abused." When asked if she found that by a preponderance of the evidence it is more probably true than not that there was sexual abuse of the child, Dr. Britton responded "I would say so."

Betty Clarke testified on behalf of appellee. Clarke has a master's degree in social work, and counseled A.V. at the Carousel Clinic during the last half of 1989. A.V. was brought to her because she was having problems with regressive behavior and with nightmares. Clarke's counseling was done in the form of play therapy during which the counselor and child play with various toys and household items, providing an opportunity for the child to express her feelings and for the counselor to observe how serious the child's emotional problems actually are. During one session, A.V. volunteered that she used to have nightmares about what her dad did to her, but now she's not having them much anymore.

Clarke counseled A.V. in this manner for six months, and when asked at trial whether A.V.'s behavior was consistent with that of other children who had been sexually abused, Clarke responded affirmatively. Clarke also testified that during the therapy sessions there was no indication that A.V. had been programmed to talk about her father in a certain way, or to accuse him of things that had not happened.

___

**4.** Appellee testified that on one occasion A.V. told her that her daddy's pee pee felt like a sausage.

Paul Dilena testified that he is a crime prevention specialist for the Fort Worth Police Department, and he hires out to supervise visitation in family situations. In 1989 he was hired to supervise three or four visits with A.V. and appellant at the visitation center provided by the Department of Human Services. Dilena stated that when A.V. was put into his custody and before appellant arrived for the last visit, A.V. told Dilena that my daddy is not going to hurt my pee pee anymore. Within the first five minutes after the trio entered the private visitation room, A.V. repeated her statement that you're not going to hurt my pee pee anymore.

Shelly Sullivan, a psychotherapist and former employee of appellee's, testified that during 1988 she observed regressive behavior on the part of A.V., and this became progressively more regressed through the end of 1988 and 1989. The manifestations of A.V.'s regressed behavior were that she showed little curiosity, took little initiative, was scared and serious, had nightmares, cried often, and was withdrawn and lethargic. Sullivan stated that on one occasion A.V. talked about not wanting to go to her daddy's house, and she was scared of her daddy. On another occasion in the fall of 1989, Sullivan, appellee, and A.V. were driving somewhere and A.V. started talking about her daddy and that he had hurt her and it was her fault. Lastly, although Sullivan related one incident where she thought she saw appellant hugging A.V. and his hand was inside A.V.'s panties, we note that Sullivan was inside her car at the time in front of appellant's house, and viewed the scene through the windows of her car and the house, in the light of her car headlights.

Appellee claimed that during their marriage appellant frequently attended pornographic movies and hid hardcore pornographic paperbacks throughout the house. Appellee also related an incident which occurred when A.V. was an infant and appellant was staying home caring for her. Appellant called appellee at her office and asked her to return home, saying he might be suicidal. When appellee arrived home, appellant told her there was something horribly wrong with him, and he would rather read pornography and masturbate than have sex with an adult woman, that he had never responded to her as an adult woman, and that he had only viewed her as his mother. When appellant testified at trial, he described this incident as a "panic attack" brought on due to his sense of inadequateness in his own life, and the increased responsibility he felt by having A.V. He did not mention appellee's claims concerning his purported statements about pornography and his sexual desires.

Appellant was the only witness to testify on his behalf. He disputed all allegations of sexual abuse by him, and portrayed his relationship with A.V. as that of a loving, warm, properly attentive parent. Appellant acknowledged that when A.V. stayed with him in 1988, she began having tantrums and calling appellee on the telephone begging to come home. He stated that he did not know the cause for this unusual behavior. Appellant contended that because the alleged sexual abuse outcry occurred only one day after a modification hearing in this case that upset appellee, the allegations were manufactured by appellee, and A.V. was programmed to relate her accusations against her father. Appellant testified that when A.V. stayed with him he occasionally bathed her, using a wash cloth, but that he never touched A.V.'s genital area other than in routine bathing.

We have thoroughly reviewed all the evidence presented to the trial court. In a case tried before the court, we must assume that the judge disregarded any incompetent evidence, and we must uphold the lower court's judgment where competent evidence exists which supports the judgment. *Gillespie v. Gillespie*, 644 S.W.2d 449, 450 (Tex.1982). Therefore, considering the entire record, but disregarding the evidence concerning the results of the penile plethysmograph, we find clear and convincing evidence establishing a violation by appellant of section 15.02(1)(E) of the Texas Family Code.

We must next determine whether there is clear and convincing evidence that termi-

nation of appellant's parental rights would be in the best interest of A.V. The Supreme Court of Texas in *Holley* listed some of the factors that have been considered by the courts in ascertaining the best interest of the child. Included among these are the following:

(1) The desires of the child and the emotional and physical needs of the child now and in the future;

(2) the emotional and physical danger to the child now and in the future;

(3) the parental abilities of the individual seeking custody, and the programs available to assist this individual to promote the best interest of the child;

(4) the plans for the child by the individual seeking custody, and the stability of the proposed home;

(5) the acts or omissions of the parents which may indicate that the existing parent-child relationship is not a proper one; and

(6) any excuse for the acts or omissions of the parents.

*Holley,* 544 S.W.2d at 371–72.

We recognize that appellee is an interested, biased party in this litigation. Nonetheless, she is A.V.'s managing conservator and has been A.V.'s primary caretaker for several years prior to trial. Appellee testified that even after supervised visitation ceased and she and A.V. had moved to Arizona, A.V. was still very apprehensive about her father finding her, and angry whenever she received any correspondence from him.

Betty Clarke testified that in her expert opinion as a practicing psychologist, based upon her interaction with and observations of A.V. during six months of therapy, it would be in A.V.'s best interest for appellant's parental rights to be terminated.

Shelly Sullivan, another psychologist, stated her expert opinion that because appellant has not admitted his guilt and sought treatment, it would be unhealthy for there to be any contact between A.V. and appellant.

It is evident from viewing the videotaped interview between A.V. and the caseworker that A.V. was clearly upset about appellant's actions in touching her genital area and hurting her. A.V. told the caseworker to tell appellant "don't touch my pee pee again."

After thoroughly reviewing the evidence, we find there is clear and convincing evidence to support the trial court's finding that termination of appellant's parental rights is in the best interest of A.V.

We overrule appellant's first point of error.

■■■ Appellant's fourth point of error asserts the trial court erred in failing to allow appellant to call as a witness a psychologist who had been appointed by the court. On June 28, 1989, the Court Master appointed Dr. Swen Helge to evaluate A.V., pursuant to TEX.R.CIV.P. 167a(d) which provides:

**(d) Cases Arising Under Title II, Family Code.**

In cases arising under Title II, Family Code, on the court's own motion or on the motion of a party, the court may appoint:

(1) one or more psychologists to make any and all appropriate mental examinations of the children who are the subject of the suit or any other parties *irrespective of whether a psychologist has been listed by any party as an expert who will testify.*

*Id.* (emphasis added). When appellant attempted to call Dr. Helge as a witness at trial, the court refused to permit Helge to testify because he had not been listed as a witness in response to interrogatories that appellee had propounded to appellant.[5] It is undisputed that the interrogatories [6]

---

**5.** The trial court ruled that because appellant had not responded to these interrogatories, appellant was not permitted to call any expert witnesses or fact witnesses, except appellant himself.

**6.** 2. Identify each expert witness who will be called to testify in this cause, giving such person's area of expertise, the substance of the opinions to which the expert will testify, the basis for such opinions, and your fee arrangement with such expert.

were received by appellant's prior attorney and that no answers were ever filed.

Rule 215(5) of the Texas Rules of Civil Procedure states:

> **5. Failure to Respond to or Supplement Discovery.**
>
> A party who fails to respond to or supplement his response to a request for discovery shall not be entitled to present evidence which the party was under a duty to provide in a response or supplemental response or to offer the testimony of an expert witness or of any other person having knowledge of discoverable matter, unless the trial court finds that good cause sufficient to require admission exists. The burden of establishing good cause is upon the party offering the evidence and good cause must be shown in the record.

TEX.R.CIV.P. 215(5).

The Texas Supreme Court has stated that Rule 215(5) is mandatory, and its sole sanction—exclusion of evidence—is automatic, unless there is good cause to excuse its imposition. *Alvarado v. Farah Mfg. Co., Inc.*, 830 S.W.2d 911, 914 (Tex.1992) (opinion on reh'g). The good cause exception permits a trial court to excuse a failure to comply with discovery in difficult or impossible circumstances. *Id.*

In his brief, appellant does not argue that he established good cause, as required in Rule 215(5). Rather, his contention is that the automatic exclusion of the court appointed psychologist is a clear abuse of discretion "in light of the statutory exemption" under Rule 167a(d). Appellant alternatively contends the sanction in this case does not meet the two standards set forth in *Transamerican Natural Gas v. Powell*, 811 S.W.2d 913, 917 (Tex.1991).

In *Transamerican*, the Texas Supreme Court discussed the sanctions allowed by Rule 215 paragraphs (1)–(3). *Id.* at 916–18. The Court held that if the trial court imposed any of the permissive discovery sanc-

tions of Rule 215(1)–(3), the sanction must meet two standards: 1) it must be a "just sanction" "directed against the abuse and toward remedying the prejudice caused the innocent party"; and 2) the sanction must not be excessive—the punishment should fit the crime. *Id.* at 917.

The trial court in the instant case was authorized under Rule 167a(d) to appoint a psychologist to examine A.V. "irrespective of whether a psychologist has been listed by any party as an expert who will testify." TEX.R.CIV.P. 167a(d). The rule does not purport to exempt such witness from the discovery disclosure requirements of the Rules of Civil Procedure or from the mandatory sanctions of Rule 215(5). In *Alvarado*, the Texas Supreme Court discussed the requirements imposed in *Transamerican* and reaffirmed that the trial court has no discretion to admit the testimony of an undisclosed witness in the absence of a showing of good cause. *Alvarado*, 830 S.W.2d at 914–15. The *Alvarado* court addressed whether the mandatory exclusion of undisclosed witness testimony under Rule 215(5), absent a finding of good cause, is always just and appropriate (i.e., whether the punishment fits the crime, per *Transamerican*). *Id.* at 915. The Court opined:

> As written, however, Rule 215(5) prescribes a single sanction for failing to supplement discovery, and we are not free to disregard its plain language. Nor should we revise the rule by opinion. The Legislature has provided that notice be given before rules amendments become effective. TEX.GOV'T CODE § 22.004. In addition, this Court has structured the rules revision process to encourage advice and comment from the bench and bar, and from the public generally. Any revision in Rule 215(5) should be left to those processes, which are underway. Last year the Court appointed task forces to study the conduct of discovery and the imposition of sanc-

---

3. Identify each expert who will not be called to testify at trial, whose opinions or work product will form a basis of the opinion of any expert witness who will testify in this action.

4. Identify each psychiatrist, psychologist, or any other mental health professional who has counseled or treated you during the five years preceding the filing of this action.

tions, and to make recommendations for revisions in the rules. The Court's Rules Advisory Committee, the State Bar's Committee on the Administration of Justice, and other groups have undertaken similar studies. While those processes are at work, we adhere to the language of the rule and our consistent precedent.

*Id.*

Because we are not free to disregard the plain language of Rule 215(5) and the Texas Supreme Court's holding in *Alvarado,* we hold that if a party seeks to call as a witness a psychologist who has been appointed by the trial court under the authority of TEX.R.CIV.P. 167a(d), that party must list the witness in discovery responses, or establish good cause for failure to do so.

Inasmuch as appellant did not list Dr. Swen Helge as an expert witness in response to interrogatories, and does not contend he established good cause for not doing so, we hold the trial court did not err in refusing to permit Dr. Helge to testify. Appellant's fourth point of error is overruled.

The judgment of the trial court is affirmed.