COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



|  |  |  |
|---|---|---|
| R.H., | § | No. 08-12-00363-CV |
| Appellant, | § | Appeal from |
| | § | |
| v. | § | 65th District Court |
| | § | |
| TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, | § | of El Paso County, Texas |
| | § | (TC # 2012DCM00064) |
| Appellee. | § | |

## **O P I N I O N**

This is an appeal from an order terminating the parental rights of a mother and father to two of their children.  Both parents appeal and the causes have been consolidated for purposes of briefing.[1]  Our recitation of the facts in each opinion will be identical.  Issues for review will be addressed separately.  Since both parents have the same initials, we shall refer to them as Mother and Father.  What follows is the tragic story of eight of their children and the birth of a ninth.

### **FACTUAL SUMMARY**

The Texas Department of Family and Protective Services became involved with the family in 2006 and their parental rights to five children were terminated in 2007.  Their rights to a sixth child were terminated in New Mexico the following year.  Two little boys, EH (born July 5, 2008) and HH (born November 29, 2009) are the subject of this suit.  In 2010, a case was

---

[1]  Mother's appeal bears Cause No. 08-12-00363-CV.  Father's appeal bears Cause No. 08-12-00364-CV.

opened on EH due to neglect. It was closed a year later after Mother completed in-patient therapy, family violence classes, and parenting classes. The boys were ultimately removed from the home due to events occurring over the course of New Year's Eve 2011 which resulted in the death of their infant sister, CH. According to the record, the Department received a referral of neglectful supervision of the three children. Early in the morning hours of January 1, 2012, Mother breast-fed the baby and, being both tired and intoxicated, did not return the infant to the playpen where she usually slept. Instead, Mother kept the child in her bed where the boys were also sleeping. When the boys woke their mother later in the morning, she found the baby pale, cold, and unresponsive. The child died later that day.[2]

On January 3, 2012, the Department filed suit and the court issued an order removing the boys and placing them in the temporary conservatorship of the Department. Priscilla Cox was the Department case worker for EH and HH. On January 19, 2012, she met with both parents, discussed the Department services they would be required to complete, and made referrals for those services. During the month that followed, neither parent made progress with services and they were missing visits with the boys.

Toward the end of January or early February, Cox spoke with Mother about the long history of family violence. At the time, Mother was crying, upset, and homeless. She was overwrought by the child's death and had no place to stay. She was living with friends, and didn't know where Father was. Cox referred her to the Center Against Family Violence. Mother completed a drug and alcohol assessment and was urged to enter in-patient treatment at Aliviane to address her use of alcohol and cocaine. She failed to do so. Similarly, Father failed to provide proof that he had completed any of the services required by the Department. He never provided

---

[2] The facts relating to the events of New Year's Eve were contained within an affidavit attached to the Department's petition and reference a statement Mother gave to police after her daughter's death. As we will discuss below, Mother refused to testify at trial.

a report from a psychosocial assessment and Cox did not know if he had completed one. Father was referred to the Center Against Family Violence BIP program, but he never offered evidence of completion. He provided no employment information.

Given the parents' lack of progress, missed visitation opportunities, and the fact that their rights to six other children had been terminated, the Department requested an aggravated circumstances finding against both parents.[3] At a status hearing on March 7, 2012, the trial court made the requisite finding as to Father and waived the requirements that the Department provide him with a service plan or continue efforts toward reunification. The court denied the request as to Mother and gave her another opportunity to comply with court ordered services. At the time of the hearing, Mother was enrolled in the Aliviane treatment program, but she left three weeks later and did not return. Consequently, the court granted the Department's request for a finding of aggravated circumstances as to Mother and set an accelerated trial date.

This case was tried to the bench on June 26, July 27, and December 5, 2012. Cox testified on the first day of trial. From the beginning, the parents were having supervised visits with the children. The early visits were inconsistent. The parents would be late or did not show up. Mother later complied with weekly visits while Father did not. Mother was still living with Father. Cox related that the boys have special needs. She offered her opinion that neither Mother nor Father are capable or willing to give the children the love and support necessary to meet their physical and emotional needs. When questioned about their "special needs", Cox recounted that the boys needed speech therapy, noting, "They do not speak." Neither child would make eye contact. The younger child has a cleft pallet and needed additional surgery. The older boy was unable to verbalize his thoughts or feelings and was not developmentally on

---

[3] An aggravated circumstances finding allows the court to waive the requirement of a service plan and the requirement that the Department make reasonable efforts towards reunification. TEX.FAM.CODE § 262.2015 (West 2012).

target for his speech. The Department arranged for speech therapy on a weekly basis. The parents were aware of the cleft pallet issues but did not believe either boy had speech issues.

Cox then described the interaction of the parents and children during the visitation periods. Mother "went through the motions" but Cox had not observed any love, any attachment or any bond. "It's very superficial." Father would sit in a chair and play with the children a little bit, but he did not move. Mostly, he directed Mother to take them to wash their faces, or use the bathroom. He would leave early. After an hour or so, the children usually asked for their foster mother. As to the circumstances at the time of trial, Cox related that Mother and Father were still "in the same boat they were back in January 1st of 2012," noting that they lived in the same home. They were still drinking. Mother was pregnant again. There had been no change in their environment or within themselves. They had no support group. Mother did not complete her treatment at Aliviane and left after three weeks, expressing anxiety because of her interaction with other patients. She did begin the out-patient program but Cox had not been informed that Mother completed the treatment. She never received any certificates of completion of services for either parent. They had not said they wanted the children back nor did they indicate what their plan would be if the family were reunited. EH had eye surgery but neither parent attended. Cox also explained that the couple never moved past supervised visits. Father was controlling and would not allow Mother to speak unless he gave permission. Cox needed to make sure the children were safe, protected, and had a secure environment. The children considered their foster parents as Mom and Dad and had become more verbal. They were talking. They were able to vocalize their needs instead of pointing at objects and grunting. Cox believed termination to be in the children's best interest because they needed stability and a home free from domestic violence.

4

Before the second scheduled hearing in July, Father's counsel notified the court that criminal indictments for the death of CH were anticipated. Counsel announced his client would invoke his Fifth Amendment right against self-incrimination and sought a continuance. The continuance was granted, but at the December hearing, Father still declined to testify, invoking his constitutional protection to the following questions:

- whether he is the father of either child;

- whether he and Mother are married;

- whether he complied with a service plan;

- whether he was arrested for family violence assault against Mother in 2002;

- whether he was arrested and convicted of family violence against Mother in 2008 and again in 2009;

- whether he was arrested for public intoxication;

- whether he was arrested for possessing a controlled substance;

- whether he was arrested for injury to a child in 2001;

- whether he was arrested for assault bodily injury in 2003;

- whether he was arrested for theft in 2004;

- whether he was arrested and convicted of driving while intoxicated;

- whether he spent thirty days in jail for the DWI conviction;

- whether his parental rights were terminated with regard to six children;

- whether he was living with Mother on December 31, 2011;

- whether Mother is an alcoholic; and

- what transpired in the home on New Year's Eve when CH died.

Mother also invoked her Fifth Amendment rights and refused to answer the following questions:

- whether she is the mother of EH and HH;

• whether she is living with Father;

• whether she is married to Father;

• whether she is a victim of family violence;

• whether her paternal rights to six other children have been terminated;

• whether she is employed;

• whether she has sought services;

• whether the boys slept in bed with her and how many beds were in the home; and

• what transpired on New Year's Eve 2011 when CH died.

Grace Gonzales then testified that she is employed by Child Protective Services as a case worker assistant. She had been supervising weekly visits with EH and HH since March 2012. These visits lasted two hours. Gonzales believed Mother felt comfortable with her while Father was usually upset or confrontational. She described Mother as arriving early while Father had a habit of being very late. He had shown up intoxicated at least twice. He would "get in [her] face and be very upset" if the foster parents had already taken the boys home. In Gonzales' opinion, Mother interacted with the children more than Father. Mother had told her there was violence in the home and that she was afraid of Father. She admitted to drinking problems but claimed to have stopped drinking. On the other hand, she complained that Father drinks every day. Mother told Gonzales that she had been living with her mother for the past two weeks.

Cox testified again at the December hearing. At this point, she had received Mother's certificate of completion of the substance abuse program at Aliviane. She had completed family violence classes, but she was still lacking individual therapy and a psychosocial assessment. Cox had recently conducted a home visit to check for space and availability. Mother and Father were together at the residence with their newborn baby. Father never emerged from the bathroom.

Cox described the small home as consisting of a kitchen, living room, and one bedroom. The bedroom still contained a full size bed. There were no beds for the boys but there was a playpen for the baby. Cox continued to be concerned about where the boys would sleep. She feared they would sleep in the full size bed with their parents. She wanted separate living spaces for each child so that the same thing would not happen again.

## BURDEN OF PROOF

The natural right of a parent to the care, custody, and control of their children, is one of constitutional magnitude. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see also Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982)(acknowledging that a parent's rights to "the companionship, care, custody, and management" of their children are constitutional interests, "far more precious than any property right.") Not only is a parent's interest in maintaining custody of and raising his or her children "paramount;" it is quite possibly the oldest fundamental liberty recognized by our Courts. *See In the Interest of M.S., E.S., D.S., S.S., and N.S.*, 115 S.W.3d 534, 547 (Tex. 2003)(noting that Texas courts recognize that "a parent's interest in maintaining custody of and raising his or her child is paramount"); *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000)(in discussing the constitutional stature of parental rights, the United State Supreme Court said, "the interest of parents in the care, custody, and control of their children--is perhaps the oldest of the fundamental liberty interests recognized by this Court."); *see also In re M.S.*, 115 S.W.3d at 549 ("Termination of parental rights is traumatic, permanent, and irrevocable.").

Although parental rights are of constitutional magnitude, they are not absolute. *In the Interest of C.H.*, 89 S.W.3d 17, 26 (Tex. 2002)("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that

7

emotional and physical interests of the child not be sacrificed merely to preserve that right."). A parent's rights may be involuntarily terminated through proceedings brought under Section 161.001 of the Texas Family Code. *See* TEX.FAM.CODE ANN. § 161.001 (West 2012). Under this provision, the petitioner must establish one or more of the acts or omissions enumerated under subsection (1) as grounds for termination and must also prove that termination is in the best interest of the child. *See id.* Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Texas Department of Human Services v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Because of the elevated status of parental rights, and the severity and permanency of termination, the quantum of proof required in a termination proceeding is elevated from the preponderance of the evidence to clear and convincing evidence.[4] *Santosky*, 455 U.S. at 747, 102 S.Ct. at 1391; *accord Holick*, 685 S.W.2d at 20-21.; *see In re M.S.*, 115 S.W.3d at 547 and *In the Interest of D.S.P. and H.R.P.*, 210 S.W.3d 776, 778 (Tex.App.--Corpus Christi 2006, no pet.)(cases recognizing that involuntary termination of parental rights is a drastic remedy which divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent.); *see also In the Interest of B.L.D.*, 113 S.W.3d 340, 353-54 (Tex. 2003)(noting that because of the severity and permanency of termination, due process requires the party seeking to terminate parental rights prove the necessary elements by the heightened burden of proof of clear and convincing evidence.).

"Clear and convincing evidence" means the measure or degree of proof that "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX.FAM.CODE ANN. § 101.007 (West 2012); s*ee In the Interest of*

---

[4] This heightened standard is likewise statutorily mandated. *See* TEX.FAM.CODE ANN. § 161.001 (West 2012)(stating that, "The court may order termination of the parent-child relationship if the court finds **by clear and convincing evidence . . . .**" [Emphasis added]).

8

*J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also In the Interest of J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007)(contrasting the standards applied in termination proceedings and the standards applied in modification proceedings); *In the Interest of C.D.*, No. 02-10-00070-CV, 2011 WL 1743688, at *4 (Tex.App.--Fort Worth May 5, 2011, no pet.). This intermediate standard falls between the preponderance of evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979); *In re D.T.*, 34 S.W.3d 625, 630 (Tex.App.--Fort Worth 2000, pet. denied)(op. on reh'g). Although the proof must be more than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *Addington*, 588 S.W.2d at 570. We strictly scrutinize termination proceedings, and construe any statutes involving involuntary termination in favor of the parent. *Holick*, 685 S.W.2d at 20-21; *In the Interest of A.V.*, 849 S.W.2d 393, 400 (Tex.App.--Fort Worth 1993, no writ).

## STANDARDS OF REVIEW

When reviewing legal sufficiency or "no evidence" challenges to termination findings, we consider all of the evidence in the light most favorable to the trial court's finding, "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In the Interest of J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005), *quoting In re J.F.C.*, 96 S.W.3d at 266. We give deference to the fact finder's conclusions, indulge every reasonable inference from the evidence in favor of that finding, and presume the fact finder resolved any disputed facts in favor of its findings, so long as a reasonable fact finder could do so. *Id.*; *In re J.F.C.*, 96 S.W.3d at 266. We disregard any evidence that a reasonable fact finder could have disbelieved, or found to have been incredible, but we do not disregard undisputed facts. *In re J.P.B.*, 180 S.W.3d at 573; *In re J.F.C.*, 96 S.W.3d at 266. A legal sufficiency or no

9

evidence point will only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *See Swinney v. Mosher*, 830 S.W.2d 187, 194 (Tex.App.--Fort Worth 1992, writ denied).

In reviewing the evidence for factual sufficiency, we must give due deference to the fact finder's findings, and we cannot supplement such judgment with our own. *In the Interest of H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006), *citing In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002) *and Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d at 108; *quoting In re J.F.C.*, 96 S.W.3d at 266 (internal quotations omitted). Moreover, in applying this standard, our review "must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d at 26; *citing Santosky*, 455 U.S. at 767-69, 102 S.Ct. 1388; *see also In re H.R.M.*, 209 S.W.3d at 108.

### STATUTORY PREDICATES

Mother's parental rights were terminated pursuant to Section 161.001(1)(M).[5] She has not challenged the finding nor complained that the evidence is legally or factually insufficient. She has thus conceded the statutory predicate for termination.

---

[5] The statute provides that a parent's rights may be terminated if the court finds by clear and convincing evidence that she had her parental rights terminated with respect to another child based on a finding that her conduct was in violation of Paragraph (D)("knowingly place or knowingly allowed the child to remain in conditions or surroundings which engaged the physical or emotional well-being of the child") or Paragraph E ("engaged in conduct or

10

**BEST INTEREST OF THE CHILDREN**

There is a strong presumption that a child's best interests are served by maintaining the parent-child relationship. *In the Interest of L.M.*, 104 S.W.3d 642, 647 (Tex.App.--Houston [1st Dist.] 2003, no pet.). The Supreme Court has set forth a list of non-exclusive factors which can be used to determine a child's best interests. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). The determination of a child's best interest does not require proof of any unique set of factors, and it does not limit proof to any specific factors. *Id.* Under *Holley*, in reviewing the sufficiency of the evidence to support a best-interest finding, courts may consider (1) the desires of the child, (2) the present and future physical and emotional needs of the child, (3) the present and future emotional and physical danger to the child, (4) the parental abilities of the persons seeking custody in promoting the best interest of the child, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by the individuals or agency seeking custody, (7) the stability of the home or proposed placement, (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate, and (9) any excuse for the parent's acts or omissions. *Id.* The same evidence of acts or omissions used to establish grounds for termination under Section 161.001(1) may be probative in determining the best interests of the child. *In re C.H.*, 89 S.W.3d at 28; *In re L.M.*, 104 S.W.3d at 647. Termination of the parent-child relationship is not justified when the evidence shows merely that a parent's failure to provide a more desirable degree of care and support of the child is due solely to misfortune or the lack of intelligence or training, and not to

---

knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child") or substantially equivalent provisions of the law of another state. Petitioner's Exhibit 5 is a Texas order dated July 10, 2007, revealing that Mother's rights to five children were terminated on both of these grounds.

11

indifference or malice. *Clark v. Dearen*, 715 S.W.2d 364, 367 (Tex.App.--Houston [1st Dist.] 1986, no writ).

As we have noted, Mother did not challenge the statutory predicate for termination. She does bring three issues for review with regard to the trial court's finding of best interest. In Issue One, she complains that the trial court failed to apply the equal inference rule[6] and that inferences from her invocation of the Fifth Amendment could not have been considered for any purpose. Her argument stems from the form of the questions propounded by the Department. For example, she quotes the following exchange:

> Q: And Ma'am, you have not completed all the services that CPS has asked you to do; correct?
>
> Counsel: Objection as to form, Your Honor.
>
> The Court: Overruled.
>
> The Witness: I am not going to answer any question under the Fifth Amendment.

From this she concludes that a reasonable inference may not be drawn:

> First, there are multiple factual issues suggested by the question and under the equal inference rule, portions of the question may be 'correct' and other portions may be 'incorrect'; there is no single inference which may be drawn. Is it *correct* that CPS asked [Mother] to complete Services? . . . Alternatively, is it correct that [Mother] completed some, but not all services (whether CPS asked her to complete them or not)?

Directing our attention to *Lozano v. Lozano*, 52 S.W.3d 141, 150 (Tex. 2001) and *Texas Dept. of Public Safety v. Sanchez*, 82 S.W.3d 506, 513 (Tex.App.--San Antonio 2002, no pet.), Mother argues that a fact finder may draw reasonable inferences from a party's assertion of the privilege against self-incrimination, but the privilege must be asserted in response to a specific inquiry so

---

[6] The "equal inference rule" provides that a fact finder may not reasonably infer an ultimate fact from meager circumstantial evidence "which could give rise to any number of inferences, none more probable than another." *Hammerly Oaks, Inc., v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997).

that a judge may evaluate whether an answer to the question would tend to incriminate the witness.

The Department counters that the equal inference doctrine is misplaced, referencing the following direct evidence: (1) Mother has an extensive history with the Department; (2) has been in and out of drug and alcohol treatment for more than a decade yet has relapsed; (3) is in a physically violent relationship with Father; (4) has had her parental rights to six other children involuntarily terminated; (5) has not expressed any desire to have the children returned to her; (6) did not complete services in the case; (7) had one child die while in her care; (8) has not made any changes to her home since the children were removed; and (9) does not have the ability to provide for their needs.

Assuming without deciding that the equal inference rule is applicable here, we nevertheless conclude that there is clear and convincing direct evidence from other witnesses that supports the best interest finding. We overrule Issue One, which brings us to the next two issues. In Issues Two and Three, Mother challenges the legal and factual sufficiency of the evidence to support the best interest finding because (1) there was no plan of permanency other than foster care; (2) Mother had engaged in meaningful services; (3) Mother was observed to engage in appropriate nurturing with the children; and (4) the children would be safe with their Mother if they all lived with the maternal grandmother. As to a permanency plan, the Department established that the boys were in foster care, the foster parents do not wish to adopt them, but adoption is the goal. Cox recounted the services requested by the Department, the finding of aggravated circumstances, the services Mother completed and those she did not. We have detailed the testimony of Cox and Gonzalez concerning Mother's interaction with the children during visitation. Mother told Gonzalez just two weeks before the final day of trial that she was

13

living with the grandmother, but when Cox arrived for a home study, she found Mother and Father still living together with their newborn. The circumstances were exactly the same as on the tragic night that CH died. The baby was sleeping in a playpen. Mother and Father had a full size bed, but there were no other beds for the boys. Mother had admitted to the caseworkers that there was family violence in the home and that she was afraid of Father, yet she remained with him. She claimed to have stopped drinking but admitted Father drank regularly. She remained with him. She herself has been in and out of substance abuse therapy since 2000 and has frequently relapsed. The repetitive pattern of violence, substance abuse, and ultimate termination of rights to her children is sadly apparent. The trial court could have reasonably found Mother's past conduct indicative of her inability to nurture the boys or to meet their physical and emotional needs. *See In re T.G.*, No. 14-09-00299-CV, 2010 WL 1379977, at *9 (Tex.App.--Houston [14th Dist.] Apr. 8, 2010, no pet.). In light of all of the evidence, the trial court could have reasonably formed a firm belief or conviction that termination of Mother's parental rights was in the best interest of the children. Because the evidence is both legally and factually sufficient, we overrule Issues Two and Three and affirm the trial court's order.

March 28, 2013

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rivera, and Rodriguez, JJ.

14